Toomey, J.
Plaintiff, West Boylston Cinema Corporation (“West Boylston”), an exhibitor of “sub-run” movies,[1] brings this action against National Amusements, Inc. (“National”), a competing exhibitor, and Paramount Pictures Corporation (“Paramount”), a movie distributor, alleging that Paramount’s grant of a “clearance” to National (i.e. licensing that enabled National to run allegedly more profitable “first-run” movies to West Boylston’s exclusion), was unreasonable and constituted an unlawful vertical non-price restraint of trade.[2] West Boylston’s amended complaint alleges violations of the Massachusetts Antitrust Act, G.L.c. 93, §§4 and 5 (Count I), the Massachusetts Consumer Protection Act, G.L.c. 93A, §11 (Count II), the Blind Bidding Act, G.L.c. 93F, and actual and prospective business relationships (Count IV).[3]
Each of the defendants now move, pursuant to Mass.R.Civ.P. 56(c), for summary judgment on all counts. For the reasons that follow, their motions are ALLOWED in part and DENIED in part.[4]
BACKGROUND
The evidence offered in connection with the present motion is voluminous. After careful and methodical review of the nearly eight inches of summary judgment materials, including hundreds of pages of deposition transcripts and affidavits, this court finds the following facts, when taken in a light most flattering to the plaintiff, to be material and undisputed.
A. Overview of the Movie Distribution Business[5]
In the motion picture industry, after a film is made, but before it is released for exhibition, distributors, such as Paramount, prepare “national marketing plans” to project the optimal number of markets in which they will run their films and the number of exhibitors they will simultaneously license within each market.[6] Once the markets have been determined, distributors then generally invite exhibitors in an area to submit written “bids” or to negotiate directly for licenses to run films that interest them.[7]
“Bidding” for films or “product” is a process by which “two or more exhibitors in a specific zone ... offer written or oral bids to license, and thus exhibit, first-run films. Successful ”bidders" are then given the opportunity to play first-run films. See Deposition of Thomas F. Molen (“Molen Depo.”) at 39-43 attached to Affidavit of Jennier Grace Miller (“Miller Aff.”) as Exhibit 5 (emphasis added). In evaluating bids and determining which exhibitors to license, a particular movie distributors will examine, inter alia, each exhibitor’s box office grossing potential.[8] The successful bidding exhibitor will customarily pay the distributor a film rental amount plus a percentage of its weekly gross profits from ticket receipts in return for a license to exhibit the bid-for film. A film distributor’s revenues (and an exhibitor’s corresponding ability to license first-run films) depend in large part, therefore, on the exhibitor’s ability to attract the public — the higher the box office gross of the film exhibitor, the higher the return for the distributor.
*531 To maximize their own revenues, and “to assure ... that its expected income will not be significantly diminished by the distributor’s simultaneously granting a license for the same film to a nearby competitor," exhibitors sometimes seek what is referred to in the movie business as “clearance” over a competitor. Affidavit of James Mack Folsom in support of defendants’ motion for summary judgment at 4-5 ("Folsom Aff.”). Clearances are exclusive licenses that preclude distributors from simultaneously licensing other theaters, either specifically named or encompassed in a geographic area, from showing a movie while it is being exhibited by a theater whose bid is accepted.
In the instant case, as set forth in more detail below, National, on behalf of its Showcase North theater, requested and was granted clearance from Paramount over West Boylston on all films from the day West Boylston opened for business. It is that request, and subsequent grant of clearance, that form the basis of the underlying action.
B.History of West Boylston Cinema
Sometime in 1995, David Fedeli (“Fedeli”), considered building a movie theater in Central Massachusetts, and, to that end, personally investigated the Worcester metropolitan area demographics. Based on, inter alia, his belief that “the Worcester market was an under-utilized marketplace for theaters,” his impression that “people [would] travel anywhere from 15-20 minutes to go see a movie,” a demographic study he received in 1995 estimating the population within ten miles of the proposed West Boylston site to be roughly 300,000, his lifetime “movie-going” experiences, and his previous thirty years review of, and experience in, the Worcester area, Fedeli determined that the Worcester marketplace could support an additional theater.[9] He then built the West Boylston Cinema (“West Boylston”).[10]
C.The Players
West Boylston, initially intended to be a sub-run and not a first-run theater, opened for business on July 25, 1997 with five screens. It was converted from a former grocery store and shares space and parking with other businesses in the Scarlet Brook strip mall in West Boylston, Massachusetts. Three of West Boylston’s five auditoria are equipped with Dolby Digital sound systems and two with regular Dolby SR sound — each with Irwin Rocker seats. Its total seating capacity is approximately 845.[11] The cost of its construction was $1.15 million. At some point prior to opening, West Boylston altered course. Martin Zides (“Zides”), West Boylston’s film booker — the person in charge of obtaining the right to play films from movie distributors — contacted Paramount and requested the opportunity to play first-run movies. As will be discussed infra, his request was denied.
National, as aforesaid, is a competitor of West Boylston; National owns and operates two theaters in the Worcester metropolitan area — the White City theater in Shrewsbury and the eighteen-screen multiplex Showcase North theater in Worcester.[12] Both White City and Showcase North exhibit first-run movies. At the time West Boylston opened for business, National maintained approximately 1,000 screens nationwide, or roughly 3.1% of all screens operated by exhibitors in the United States. See Affidavit of James Mack Folsom at pp. 8-9. It should be noted that National is also a controlling shareholder of Viacom, Inc. (“Viacom”), Paramount’s parent corporation.
Of particular relevance to the instant dispute are the physical properties of National’s Showcase North theater. In contrast to West Boylston, Showcase North is located in its own free-standing building, just off a major highway, and offers parking on its own premises. Each Showcase North auditorium is handicap accessible and equipped with Dolby Digital sound equipment and plush rocking chair seats with cup holders. Showcase North also maintains assistive listening devices for the hearing impaired. Its total seating capacity is approximately 4,353[13] — roughly five times the capacity of West Boylston. The cost of construction was more than $25 million.
West Boylston and Showcase North are located approximately three and one-half miles apart. West Boylston is on Route 12, a single lane highway, running roughly parallel to Interstate 1-190. Showcase North is accessed at one exit further south on Interstate 1-190. It takes approximately five to seven minutes to drive between West Boylston and Showcase North. Moreover, both West Boylston and Showcase North advertise in the same local Worcester newspaper, the Telegram & Gazette.[14]
West Boylston and Showcase North are not, however, the only exhibitors in the greater Worcester metropolitan area (West Boylston’s self-described relevant geographic market).[15] In particular, there are also the Westborough Hoyts and the Solomon Pond Mall Hoyts in Berlin (collectively the “Hoyts”). Unlike West Boylston (and like Showcase North) the Hoyts theaters play first-run films — the relevant product market[16] — day-and-date with Showcase North. See newspaper clippings attached to Affidavit of Kimberly A. Stone, Esq. (“Stone Aff.”) as Exhibit 36.
Paramount, as aforesaid, is a wholly-owned subsidiary of Viacom. It produces, licenses and distributes films to exhibitors, such as West Boylston, National and the Hoyts. As will be discussed shortly, it also authorizes or grants “clearances” to exhibitors.
D.National Learns of West Boylston’s Opening and Requests Clearance
On or about July 10, 1997, Stephen Cooper (“Cooper”), film booker for National, learned through a newspaper article of the construction and anticipated opening of West Boylston. Believing that West Boylston would directly compete with Showcase North (and *532 thus siphon a portion of Showcase North’s revenue stream), Cooper set off to document his concerns: he drove to West Boylston’s site and traveled between it and Showcase North. Cooper noted that the driving distance was only 3.3 miles. Further, he observed a “general commercial activity,” “traffic flow” and “[what the] population appeared to be.” See Deposition of Stephen Cooper (“Cooper Depo.”) at pp. 16-17 attached to Stone Aff. as Exhibit K.
Following up on his observations, Cooper met with George Leavitt[17] of Paramount and suggested that National request clearance over West Boylston.[18] Id. at 17. His trepidations confirmed, Cooper then telephoned Thomas F. Molen (“Molen”), Paramount’s Sales Manager of New England[19] and specifically requested clearance “for any films that [National] licensed from the point that [West Boylston Cinema] opened.” Id. at 18. That is, National requested an exclusive license for first-run films playing in the area of its Showcase North theater. As reasons therefore, Cooper explained that, in light of his observations, National considered West Boylston to be in “substantial competition” with its Showcase North theater. Id. at 36.
Although Cooper testified that he did not then reach an agreement with Molen as to his request for clearance over West Boylston, it is undisputed that, from July 25, 1997 — the date West Boylston opened for business — to the date litigation discovery concluded, Paramount released 30 first-run films for exhibition in the Worcester market, all of which (with one exception discussed below) have been distributed to Showcase North.[20]
E. Events Thereafter
On August 29, 1997, National “discovered” that the film, “Event Horizon” was playing at both West Boylston and Showcase North. That same day, Cooper telephoned Molen and “made it very clear . . . that [National] continued in [its] desire to clear West Boylston.” Molen admitted that there had been an error, and “. . . apologize[d] for [having broken his agreement].” Id. at 64 and 67. Since that time, West Boylston has never simultaneously exhibited the same first-run Paramount film, day-and-date with Showcase North. Id.[21]
In September of 1997, Molen drove by West Boylston and viewed its location. This was Paramount’s first effort to examine the “general demographic” area in which West Boylston and Showcase North competed. See Molen Depo. at 110-11, attached to Miller Aff. as Exhibit 5. Molen returned to the Worcester area roughly three months later with his distribution manager. This time, he entered West Boylston and looked around the theater. Id. at 112-13.
At some point thereafter, Paramount initiated a meeting with Fedeli and Zides to discuss their requests for first-run films. Id. at 114. In January of 1998, Molen and other Paramount officials met with Fedeli and Zides who reiterated their requests to play day- and-date, first-run films with Showcase North. Paramount rejected these requests, but “offered” West Boylston the opportunity to bid for films. Paramount acknowledged, however, that Showcase North does not bid for its films. Id. (emphasis added).
On February 4, 1998, West Boylston initiated the instant action.
Sometime in November of 1998, ostensibly in response to Molen’s deposition testimony, Fedeli submitted a written bid to Paramount with a “$20,000 guarantee” for its “Star Trek” film.[22] His bid was returned, unopened. See Affidavit of David Fedeli at para. 7.
F. The Lawsuit
The gravamen of West Boylston’s complaint is that Paramount’s grant of clearance to Showcase North, which precludes West Boylston from simultaneously displaying first-run films, is unreasonable, unlawfully restrains trade in violation of the Massachusetts Antitrust Act, G.L.c. 93, §4 and constitutes a monopoly on, or an attempt to monopolize, the first-run product market in violation of G.L.c. 93, §5. In support of its claim, and in opposition to the instant summary judgment motions, West Boylston relies on the “expert” affidavits of its owner, Fedeli and its booker, Zides.
The defendants now separately move for summary judgment contending that West Boylston has failed to demonstrate sufficient evidence that they acted in concert or that Paramount’s clearance to National was improper. In addition, Paramount and National separately move to strike all or portions of the Fedeli and Zides affidavits. West Boylston parries the defendants’ attack on its affidavits with its own motion to strike the defendants’ expert opinions. Because the summary judgment record depends, in part, on the merits of the defendants’ and West Boylston’s motions to strike, the court will first address those motions.
DISCUSSION
I. Motions to Strike Affidavits A. Defendants’ Motions to Strike
The defendants contend not only that the affidavits of West Boylston’s proffered "experts,” Fedeli and Zides, are not based on personal knowledge, and thus in violation of Mass.R.Civ.P. 56(e), but also that they are wholly speculative and thus lack evidentiary substance. In opposition, West Boylston largely sidesteps the defendants’ contentions, choosing instead to complain about the timing of defendants’ answers to its expert interrogatories. In addressing defendants’ motions to strike, this court will focus on the substance of the Fedeli and Zides affidavits, treating, in turn, their purported personal knowledge affirmations and, thereafter their proffered expert opinions.
*533 1. Affirmations Based on Personal Knowledge.
As a general matter, affidavits in support of motions for summary judgment “shall be made on personal knowledge [and] shall set forth such facts as would be admissible in evidence.” Mass.R.Civ.P. 56(e).[23] Furthermore, it appears well settled that “[a]ll affidavits or portions thereof made on information and belief, as opposed to personal knowledge, are to be disregarded in considering a motion for summary judgment.” TLT Const. Corp. v. A. Anthony Tappe and Associates, Inc., 48 Mass.App.Ct. 1, 11 (1999), citing Shapiro Equip. Corp. v. Morris & Son Constr. Corp., 369 Mass. 968, 968 (1976), and Automatic Radio Mfg. Co. v. Hazeltine Research, Inc., 339 U.S. 827, 831 (1950). See also Johnson v. White & Quinn Ins. Agency, Civil Action No. 98-4385-F, 2000 WL 192242, *2 (Mass.Super.Ct. Feb. 3, 2000) [11 Mass. L. Rptr. 237],
At bar, the first fifteen paragraphs of Fedeli’s Affidavit, and the first seven paragraphs of Zides’ Affidavit purport to recite their general business experiences and qualifications. Without particularizing each and every paragraph of Fedeli’s Affidavit, this court concludes that most of his so-called "affirmations” are not based on his personal knowledge and/or contradict his previously sworn deposition testimony and thus must be stricken.[24] See TLT Const. Corp. v. A. Anthony Tappe and Associates, Inc., 48 Mass.App.Ct. at 11 (citations omitted). On the other hand, paragraphs 1, 2, 3, so much of 6 that relates to Paramount, paragraphs 7 and 11, sentences 4, 5, 6 and 7 of paragraph 12, sentences 1, 2, 3, 6, 8 and 9 of paragraph 13, and paragraph 14 are sufficiently based on Fedeli’s personal knowledge and need not be stricken.
Zides’ offerings fare somewhat better. After reviewing his affidavit in its entirety, this court finds that the defendants’ arguments are unpersuasive. The court concludes that paragraphs 1, 2, 4, 5, 6, and the first sentence of paragraph 7, satisfactorily set forth statements based on personal knowledge and are thus admissible under Rule 56(e). The remaining statements, however, must be excluded for the reason that they are either failed efforts to contradict his previously sworn deposition testimony, Morrell v. Precise Eng’g, Inc., 36 Mass.App.Ct. 935, 937 (1994) (deposition testimony is binding), or are based on hearsay. Madsen v. Erwin, 395 Mass. 715, 721 (1995) ("Hearsay in an affidavit is unacceptable to defeat summary judgment”).
2. Proffered Expert Opinion Testimony.
Massachusetts Proposed Rule 702 provides for the admissibility of expert opinion testimony. Rule 702 mirrors its federal counterpart and provides as follows:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
(Emphasis added.) See Commonwealth v. Lanigan, 419 Mass. 15, 25 (1994). See also Commonwealth v. Dinnall, Criminal Action No. 97-661-01, 1997 WL 625473, at *3 (Mass.Super.Ct. Sept. 29, 1997) [7 Mass. L. Rptr. 459].
Paragraph sixteen of the Fedeli Affidavit, and paragraph eight of the Zides Affidavit, purport to render expert opinions. Those so-called “expert opinions,” however, are of suspect value. As a preliminary matter, the court is concerned by the lack of clarity with which West Boylston characterizes Fedeli and Zides as “experts.” The court does, however, divine two areas in which the affiants might be experts, to wit, the movie distribution and exhibition business and matters involving antitrust and blind bidding. As Rule 702 suggests, the court begins its analysis with an examination of their qualifications in those fields. See Leibovich v. Antonellis, 410 Mass. 568, 571-72 (1991); P.J. Liacos, Handbook of Massachusetts Evidence, §7.6 (7th Ed. 1999) (“Liacos”).
As a general matter, Massachusetts jurisprudence teaches that in determining the qualifications of an expert, “[t]he crucial issue ... is whether the witness has sufficient education, training, experience and familiarity,” McLaughlin v. Board of Selectmen of Amherst, 422 Mass. 359, 361-62 (1996), quoting Letch v. Daniels, 401 Mass. 65, 68 (1987), “in the field of his testimony that the jury may receive appreciable assistance from it.” McCarthy v. Litton Industries, Inc., 410 Mass. 15, 27 (1991), quoting Commonwealth v. Boyd, 367 Mass. 169, 182 (1975). See also Harlow v. Chin, 405 Mass. 697, 713 (1989) (finding expert testimony is admissible when it relates to matters within the witness’s field of expertise); Proposed Mass.R.Evid. 702. See generally, Liacos, supra at §7.8.1. “There is no requirement that the [proffered] testimony on a question of discrete knowledge come from an expert qualified in that subspecialty rather than from an expert more generally qualified.” Commonwealth v. Mahoney, 406 Mass. 843, 852 (1990) (citation omitted).[25]
Here, neither Paramount nor National effectively disputes that Fedeli is experienced in the business of exhibiting movies and that Zides is an accomplished booker. A thorough review of the relevant and material summary judgment record also reveals that, through such experience, both are personally familiar with the industry practices, population demographics and economic trends in the Worcester metropolitan area. That they offer scant academic credentials in support of their opinions is inapposite. See Fraser and Wise, P.C. v. Primarily Primates, Inc., 966 F.Sup. 63, 69 (D.Mass. 1996). In sum, in light of Fedeli’s extensive experience in the exhibition of movies, and Zides’ similar extensive background in booking films, this court concludes *534 that they are sufficiently qualified to testify as experts in the business of exhibiting movies.
Whether either Fedeli or Zides is qualified as an expert in antitrust or blind bidding principles is, however, quite another story. In assessing their qualifications, the court will look to the recent United States Supreme Court decision of Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), for guidance. In Kumho, the Court revisited the “gatekeeping” function of the trial court previously addressed in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and later adopted in Commonwealth v. Lanigan, 419 Mass, at 25-26. Justice Breyer, delivering the opinion for the Court (and affirming the District Court’s exclusion of plaintiffs proffered engineering expert and grant of summary judgment in favor of the defendant), extended Daubert and held that the “gatekeeping” function of Fed.R.Evid. 702, the federal cognate of Proposed Mass.R.Evid. 702, applies not only to testimony based on scientific knowledge, but rather to all expert testimony — that is testimony based on technical and other specialized knowledge. Id. at 141. See Theresa Canavan’s Case, SJC Slip Op. 08226 (Aug. 17, 2000) (adopting Kumho standard for reviewing expert testimony and finding “[t]here is no logical reason why conclusions based on personal observations or clinical experience should not be subjected to the Lanigan standard").[26]
With this analytic model in mind, the court considers whether Fedeli’s and Zides’ proposed expert testimony, based on nothing more than their individual personal experiences, is sufficiently reliable to warrant submission of their opinions to a jury. For the reasons that follow, this court finds that their proposed testimony is not reliable, cannot be fairly tested and otherwise will not assist a jury in understanding any facts in issue.
First, and most important, neither affiant demonstrates any specialized experience, education, background, skills, or knowledge in anti-trust regulation or so-called “blind bidding" matters.[27] The court thus concludes that they ought not testify as experts in those areas. Second, as set forth in the margin, even assuming they were so qualified, both Fedeli and Zides utterly fail to cite any factual basis in support of their so-called “opinions.”[28] Specifically, and in contrast to the defendants’ experts, Fedeli and Zides cite to no studies or supporting materials, no reports, no statistical data, and no economic impact or market analyses of any kind.[29] In short, West Boylston urges this court to accept the unsupported, self serving and otherwise wholly speculative conclusions of its “experts.” As set forth in Kumho, however, “nothing . . . requires [this] . . . court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert.” Kumho, 526 U.S. at 157.
Absent such qualifications, and without any factual basis to support their opinions, this court cannot perform its threshold “gatekeeping” function. Stated differently, West Boylston’s submissions offer no opportunity for this court to determine the relevancy or reliability of the proposed experts’ testimony. See Kumho, supraat 158; Theresa Canavan’s Case, supra at *4. That omission is fatal. Accordingly, the court declines to recognize West Boylston’s expert evidentiaiy proffer. See SMS Systems Maintenance Svcs v. Digital Equip. Corp., 188 F.3d 11, 25 (1st Cir. 1999) (“[ejxpert opinions are no better than the data and methodology that undergrid them ... An expert must vouchsafe the reliability of the data on which he relies and explain how the cumulation of that data was consistent with the standards of the expert’s profession . .. Expert testimony that offers only a bare conclusion is insufficient to prove the expert’s point”). See also Santos v. Chrysler Corp., 430 Mass. 198, 205-07 (1999) (finding trial judge properly excluded expert opinion where it lacked factual foundation and was thus speculative); Timmons v. Massachusetts Bay Transp. Auth., 412 Mass. 646, 652-53 (1992) (reversing Superior Court decision for plaintiff and finding expert’s direct personal knowledge in one area did not ipso facto qualify him to testify about another germane issue); Goffredo v. Mercedes-Benz Truck Co., 402 Mass. 97, 103 (1988) (affirming directed verdict in favor of defendant- and finding expert’s guess and opinion based on speculation and assumption insufficient); Toubiana v. Priestly, 402 Mass. 84, 91 (1988) (“a mere guess or conjecture by an expert witness in the form of a conclusion from basic facts that do not tend toward that conclusion any more than toward a contrary one has no evidential value”). See also Van Brode Group, Inc. v. Bowditch & Dewey, 36 Mass.App.Ct. 509, 520 (1994); Wiska v. Stanislaus Social Club, Inc., 7 Mass.App.Ct. 813, 820 (1979) (affirming directed verdict based on determination that plaintiffs’ expert was not qualified); Schubert v. Nissan Motor Corp., 148 F.3d 25, 29-31 (1st Cir. 1998); (affirming grant of summary judgment in favor of defendant and finding exclusion of plaintiffs expert affidavit proper where it lacked sufficient factual foundation); Mid-State Fertilizer Co. v. Exchange Nat’l Bank, 877 F.2d 1333, 1339 (7th Cir. 1989) (“An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process”).
Paragraphs 16(3), (4), (5), (6), (7) of Fedeli’s Affidavit, and paragraphs 8(3), (4), (5), and (7) of Zides’Affidavit, are thus deficient and must be stricken. All other paragraphs, to the extent they are based on the affiants’ experience in the business of exhibiting movies, but do not contradict their previously sworn deposition testimony, are admissible.[30] Otherwise, because this court does not rely on the remaining objectionable statements due to their irrelevancy or immateriality, the motions are moot. See Fraser and Wise, P.C., 966 F.Sup. at 70.
B. West Boylston’s Motion to Strike
West Boylston similarly moves to strike the expert affidavits of D. Bariy Reardon (retained by National) and James Mack Folsom (retained by Paramount). As *535 reasons therefore, West Boylston asserts two alternative grounds. First, it argues that the affidavits should be stricken because the defendants “engaged in sharp practice by identifying these experts and providing supplemental answers to Interrogatories on the last day of discovery.” Further, West Boylston’s argument goes, “since the plaintiff did not have the opportunity to depose these gentlemen, that is a traditional ground for denying Summary Judgment under Rule 56(f).”[31]
That contention, although perhaps facially reasonable, fails to comply with the very rule on which it relies. When properly invoked, Rule 56(f) allows a party, who feels unfairly cut off from obtaining evidence necessary to withstand a motion for summary judgment, additional time to conduct discovery. See C.B. Trucking, Inc. v. Waste Management, Inc., 137 F.3d 41, 44 (1st Cir. 1998). Ordinarily, given that a Rule 56(f) motion is intended to safeguard against judges’ swinging the summary judgment axe too hastily, it “looms large when a party claims an inability to respond to an opponent’s summary judgment motion because of incomplete discovery.” Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 92 (1st Cir. 1996). Nonetheless,
[t]his does not mean, however, that Rule 56(1) has no bite or that its prophylaxis extends to litigants who act lackadaisically; use of the rule not only requires meeting several benchmarks . . . but also requires due diligence both in pursuing discovery before the summaiy judgment initiative surfaces and in pursuing an extension of time thereafter. In other words, rule 56(f) is designed to minister to the vigilant, not to those who slumber on perceptible rights.
Resolution Trust Corp. v. North Bridge Assoc., Inc., 22 F.3d 1198, 1203 (1st Cir. 1994). See also Massachusetts School of Law at Andover, Inc. v. American Bar Ass’n, 142 F.3d 26, 45 (1st Cir. 1998).
To benefit from rule 56(f), however, a party must meet at least two threshold requirements. The party invoking the rule must (1) file a timely affidavit with the court asserting the need for further discovery and (2) demonstrate that it was diligent in pursuing discoveiy before the summary judgment initiative surfaced. Here, West Boylston’s simple insertion of a citation to “Rule 56(f)” in its “Motion to Strike Experts’ Affidavits,” without an affidavit in support of such “need,” is wholly insufficient to advance its inadequate-opportunity-to-discover argument. See Brick Const. Corp. v. CEI Develop. Corp., 46 Mass.App.Ct. 837, 840 (1999) (affirming grant of summaiy judgment), citing First Natl. Bank v. Slade, 379 Mass. 243, 244-45 (1979). See also Springfield Terminal Ry. Co. v. Canadian Pacific Ltd., 133 F.3d 103, 109 (1st Cir. 1997) (same). Moreover, nothing in the record persuades this court that West Boylston was vigilant in obtaining an extension of discovery after the defendants moved for summary judgment. Accordingly, “[b]y failing to invoke [the protections of] Mass.R.Civ.P. 56(f) ... in response to the [defendants’] motion for summary judgment, [West Boylston] waived [its] right to further discovery before a decision [is] rendered on the summary judgment motion.” Brick Const. Corp., supra at 840, quoting Alake v. Boston, 40 Mass.App.Ct. 610, 611 n.3 (1996).
Second, West Boylston maintains that the Folsom affidavit should be stricken because it “is argumentative and conclusory and premised on facts which are in dispute in this case.” In its three page motion to strike, however, West Boylston cites no authority supporting its argument. Moreover, not only does controlling precedent contradict West Boylston’s conclusion, see e.g. Sacco v. Roupenian, 409 Mass. 25, 28-29 & n.3 (1990) (expert opinion can be based on “either the expert’s direct personal knowledge, on evidence already in the record or which the parties represent will be presented during the course of the trial, or on a combination of these sources"), but this court is also presented with no authority for the proposition that expert opinion testimony ought to be excluded merely because it was based on disputed facts.[32]
In sum, after thoroughly reviewing their proffered expert opinions, the factual foundation on which they rely and the substance of their statements, this court concludes that each defense affiant has appropriate experience, background and knowledge of the subject matter as to which they are offered — viz, antitrust actions and the business of exhibiting movies — and that each affidavit is well supported, is concise, and, if its substance were admitted at trial, would undoubtedly assist a jury in understanding the issues surrounding the underlying action. For those reasons, this court, concludes that the defendants’ proffered expert affidavits are admissible for Rule 56(c) purposes and shall not be stricken. Having thus determined the lawful content of the instant summary judgment record, this court now turns to the main motions.
II. Summary Judgment in the Antitrust Arena
Generally, summary judgment is granted where “the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” Mass.R.Civ.P. 56(c). See Cassesso v. Comm’r of Correction, 390 Mass. 419, 422 (1983); Community Nat'l Bank v. Dawes, 369 Mass. 550, 553 (1976). Summaiy judgment motions present this court with an opportunity to dispose of meritless cases and avoid unnecessary trials. See Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986); Schubert, 148 F.3d at 32; Harris v. Harvard Pilgrim Health Care, Inc., 20 F.Supp.2d 143, 146-47 (D.Mass. 1998). “This is true even in antitrust cases where motive and intent play leading roles, proof is largely in the hands of alleged conspirators, and hostile witnesses thicken the plot.” Orson v. Miramax Film Corp., 79 F.3d 1358, 1366 (3d Cir. 1996).
*536 To survive the defendants’ motion for summary judgment, West Boylston must establish that there is a genuine issue of material fact “as to whether [the defendants] entered into an illegal conspiracy that caused [it] to suffer a cognizable injury.’’ Matsushita Elec. Industrial Co. v. Zenith Radio, 475 U.S. 574, 586 (1986). In so doing, West Boylston “need not submit ‘direct evidence,’ i.e. the so-called smoking gun, but can rely solely on circumstantial evidence and the reasonable inferences drawn from such evidence.” Petruzzi's IGA v. Darling-Delaware Co., Inc., 998 F.2d 1224, 1230 (3d Cir. 1993), citing Big Apple BMW, Inc. v. BMW of North America, 974 F.2d 1358, 1364 (3d Cir. 1992). Massachusetts Rule 56(c) jurisprudence teaches, however, that West Boylston must do more than set forth “]c]onclusory statements, general denials, and factual allegations not based on personal knowledge.” Cullen Enterprises, Inc. v. Massachusetts Property Ins. Underwriting Assn., 399 Mass. 886, 890 (1987). “Speculation and surmise, even when coupled with effervescent optimism that something definite will materialize further down the line, are impuissant in the face of a properly documented summary judgment motion.” Roche v. John Hancock Mutual Life Ins. Co., 81 F.3d 249, 253 (1st Cir. 1996).[33]
Furthermore, while summary judgment for the defendant may be disfavored in some antitrust actions, “in the absence of any significant probative evidence” supporting allegations of antitrust violations, “it can be [and has been] applied in the twinkling of an eye.” Theee Movies of Tarzana v. Pacific Theaters, Inc., 828 F.2d 1395, 1398 (9th Cir. 1987) (affirming summary judgment in favor of defendants). See GTE Products Corp. v. Broadway Elec. Supply Co., Inc., 42 Mass.App.Ct. 293, 302 (1997) (affirming grant of summary judgment in favor of defendant-in-counterclaim); Fordham v. Cole, Civil Action No. 90-6563, 1991 WL 718188, at *2 (Mass.Super.Ct. Oct. 10, 1991) (awarding summary judgment in favor of defendant). See also Town of Concord v. Boston Edison Co., 915 F.2d 17, 32 (1st Cir. 1990) (reversing denial of defendant’s motion for judgment notwithstanding the verdict); Capital Imaging Assoc., P.C. v. Mohawk Valley Med. Assoc., Inc., 996 F.2d 537, 547 (2d Cir. 1993); Houser v. Fox Theaters Management Corp., 845 F.2d 1225, 1233 (3d Cir. 1988) (allowing defendants’ motion for summary judgment); Egan v. Athol Memorial Hosp., 971 F.Sup. 37, 47 (D.Mass. 1997) (same); Quaker State Corp. v. Leavitt, 839 F.Sup. 76, 80 (D.Mass. 1993) (same); Remco Distributors, Inc. v. Oreck Corp., 814 F.Sup. 171, 176 (D.Mass. 1992) (allowing defendant’s motion to dismiss G.L.c. 93 antitrust claim); Winter Hill Frozen Foods and Svcs., Inc. v. Haagen-Dazs Co., Inc., 691 F.Sup. 539, 543 (D.Mass. 1988) (Young, J.) (allowing defendant’s motion for summary judgment on G.L.c. 93 antitrust claim).
For the reasons stated infra, the defendants’ motion at bar is compelling.
III. Merits of the Defendants’ Motions for Summary Judgment
In Count I of its complaint, West Boylston asserts that Paramount and National conspired to provide National’s Showcase North theater with clearances over West Boylston thereby giving Showcase North an unreasonable competitive advantage. West Boylston argues that the defendants’ concerted conduct not only restrains trade in violation of G.L.c. 93, §4, but also constitutes a monopoly or an attempt to monopolize the exhibition and distribution of first-run films in the greater Worcester metropolitan area in violation of G.L.c. 93, §5 [34]
A. Restraint of Trade in violation of G.L.c. 93, §4
Chapter 93, Section 4 of the Massachusetts Antitrust Act prohibits “lelvery contract... or conspiracy, in restraint of trade." Broadly read, West Boylston’s §4 claim alleges both conspiracy to restrain trade and actual restraint of trade via Paramount’s clearance to National. Both claims fail. Before the court considers the antitrust implications and the significance of the clearances, however, the court will first address West Boylston’s conspiracy allegations that lie at the heart. of its complaint.
B. Conspiracy to Restrain Trade
In support of its conspiracy claim, West Boylston must show direct or circumstantial evidence that reasonably tends to prove that the alleged conspirators had “a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement.” Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 771 (1984); Ben Elfman & Son, Inc. v. Criterion Mills, Inc., 774 F.Sup. 683, 686 (D.Mass. 1991). See also Orson, Inc. v. Miramax Film Corp., 79 F.3d 1358, 1366 (3d Cir. 1996). West Boylston must demonstrate that the defendants “(1) . . . acted in contradiction of their economic interests, and (2) . . . had a motive to enter into an agreement.” Houser v. Fox Theaters Mgmt. Corp., 845 F.2d at 1232 (internal quotation marks and citation omitted).
In the case at bar, West Boylston asserts that Paramount acted contrary to its economic interests by consistently choosing to license films to National’s Showcase North without ever having performed economic studies comparing West Boylston’s grossing potential with that of Showcase North. Despite that assertion, West Boylston fails to present any evidence (other than the speculation and surmise of Fedeli and Zides) which demonstrates that'West Boylston’s grossing potential rivaled that of Showcase North. Given the procedural posture of this case, the burden of evidence production properly fell on West Boylston. See Matsushita Elec. Industrial Co. v. Zenith Radio, 475 U.S. at 586, citing DeLuca v. Atlantic Refining Co., 176 F.2d 421, 423 (2d Cir. 1949) (L. Hand, J.) (nonmovant must “do more than simply show that there is some *537 metaphysical doubt as to the material facts”). West Boylston’s failure so to provide, however, is not, in and of itself, fatal. See Petruzzi’s IGA v. Darling-Delaware Co., Inc., 998 F.2d at 1230 (direct evidence, i.e. the so-called smoking gun, not needed; nonmovant can rely solely on circumstantial evidence and the reasonable inferences drawn from such evidence).
Nonetheless, even assuming that Paramount’s consistently granting National clearance for first-run films creates an inference that (1) Paramount acted contrary to its economic interests and (2) was motivated to conspire because it feared National would refuse to exhibit its movies, West Boylston fails to demonstrate that there was a “meeting of the minds” between National and Paramount and thus a cognizable injury and an actionable conspiracy. See Copperweld Corp. v. Independence Tube Corp., 467 U.S. at 777. See also Tech Plus, Inc. v. Ansel, Civil Action No. 96-1668, 1999 WL 482329 at *12 (Mass.Super.Ct. Mar. 22, 1999) (need concerted action between two persons), citing Kurker v. Hill 44 Mass.App.Ct. 184, 188 (1998); Bell Atlantic v. Hitachi Data Systems Corp., 849 F.Sup. 702, 705 (N.D.Cal. 1994). In short, Paramount’s conduct is insufficient to demonstrate the requisite agreement.
In Copperweld, the plaintiff brought an antitrust suit against a competing corporation and its wholly owned subsidiary alleging the two defendants had unlawfully conspired to restrain trade in violation of §1 of the Sherman Act — the federal counterpart of G.L.c. 93, §4. Elevating substance over form, the Supreme Court held that a parent and its wholly owned subsidiary are legally incapable of conspiring with each other. Copperweld, 467 U.S. at 779. The Court reasoned that:
a parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousness, but one . . . With or without a formal agreement, the subsidiary acts for the benefit of the parent, its sole shareholder. If a parent and its wholly owned subsidiary do agree to a course of action, there is no sudden joining of economic resources that had previously served different interests, and there is no justification for § 1 scrutiny ... [A] parent and a wholly owned subsidiary always have a unity of purpose or a common design. They share a common purpose whether or not the parent keeps a tight rein over the subsidiary; the parent may assert full control at any moment over the subsidiary if it fails to act in the parent’s best interests.
467 U.S. at 771-77 (emphasis in original).
In the instant case, the court must conclude that Viacom and its wholly owned subsidiary, Paramount, are not “two separate corporate consciousness, but one” and are thus incapable of conspiring to restrain trade. See Bell Atlantic v. Hitachi Data Systems Corp., 849 F.Sup. at 705. The Viacom-Paramount relationship is not, however, material to the present analysis. Rather, the issue at bar is whether National, as controlling shareholder of Viacom can, as a matter of law, conspire with Paramount, Viacom’s wholly owned subsidiary. For the following reasons, this court concludes that there can be no such conspiracy and thus there can be no unlawful restraint of trade in violation of the Massachusetts Antitrust Act.
National, as Viacom’s controlling shareholder, was certainly in a position to influence Viacom’s business decisions. See Black’s Law Dictionary, at 1380 (7th Ed. 1999) (defining “controlling shareholder” as one who can influence corporate decisions). See also Guthrie v. Harkness, 199 U.S. 148, 155 (1905); Bell Atlantic v. Hitachi Data Systems Corp., 849 F.Sup. at 706 (adopting Copperweld and finding “the entity with legal control effectively dictates the policies and direction of its subsidiary"). The defendants offer no antipodal evidence. Moreover, and more importantly, neither does West Boylston. To the contrary, West Boylston acknowledges in its amended complaint, and this court concludes, that Paramount was “commonly controlled” by National.[35] But, is common control sufficient to unify two otherwise independent entities and thereby vitiate the ability to conspire? The short answer, founded upon the facts at bar, is “yes.”
We follow the reasoning set forth in Copperweld. Because National and Paramount were both concerned with the same objective — improving (or at least maintaining) Viacom’s business revenues or profits for its shareholders — National could control Viacom and, through Viacom, could control Paramount, and thus there could be “no sudden joining of economic resources that had previously served different interests.” Copperweld, 467 U.S. at 771. Accordingly, there can be no conspiracy and no justification for §4 scrutiny.[36]
This court’s inquiry, however, does not end there. The fact remains whether the clearance between Paramount and National actually restrained trade in violation of §4 of the Massachusetts Antitrust Act. Since “[vjirtually all business agreements [particularly the underlying clearances] restrain trade to some extent, [antitrust laws] have been construed to make illegal only those contracts that constitute unreasonable restraints of trade." Orson, Inc., 79 F.3d at 1366 (emphasis added). The question for us thus becomes whether the underlying clearances were “reasonable.”
2. Actual Restraint of Trade
Clearances, as vertical, non-price restraints of trade, are evaluated under the rule of reason. Theee Movies of Tarzana, supra at 1398, citing Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 58-59 (1977).[37] To establish a cause of action for an unreasonable restraint of trade under the rule of reason, West Boylston must generally show: “(1) [a]n agreement among two or more persons or distinct business *538 entities; (2) which is intended to harm or unreasonably restrain competition; and (3) which actually causes injury to competition.” Quaker State Corp., 839 F.Sup. at 80 (citations omitted) (emphasis added).
Here, even assuming National and Paramount are two separate business entities and that the underlying clearances constitute an agreement, West Boylston’s actual restraint of trade antitrust claim must fail. The underlying clearances were not unreasonable restraints of trade.[38]
a. Reasonableness of Restraint
“Determining whether a particular restraint is reasonable requires a thorough investigation of the industry at issue and a balancing of the arrangement’s positive and negative effects on competition.” Id. Clearances are reasonable restraints of trade “when the theaters are [1] in substantial competition, and [2] the clearances are used to assure the exhibitor that the distributor will not license a competitor to show the movie at the same time or so soon thereafter that the exhibitor’s income will be greatly diminished.” Id., citing Paramount Pictures, 334 U.S. at 145-46.
In the case at bar, the defendants first argue that National’s Showcase North theater substantially competes with West Boylston and, therefore, West Boylston has failed to show that the defendants have unreasonably restrained competition. West Boylston counters by arguing that its theater and Showcase North are not substantially competing, or “at a minimum there are genuine issues of material fact as to whether or not they are in substantial competition.” The defendants have the better of the argument.
Substantial Competition
In determining whether West Boylston and National’s Showcase North theaters were in substantial competition, this court looks to Theee Movies of Tarzana, supra, for guidance. In Theee Movies, the Ninth Circuit found, on facts strikingly similar to those here presented, that the following factors are relevant in determining substantial competition: the proximity of the theaters, the location of the theaters with respect to major thoroughfares, whether transportation barriers exist between the theaters, whether the plaintiff theater bid on the clearances, whether the plaintiff acknowledged that his theater was substantially competitive with the defendant, whether the theaters drew customers from thé same geographical area, and whether the theaters advertised throughout the same geographical area. Theee Movies of Tarzana v. Pacific Theaters, Inc., 828 F.2d at 1399.
Applying those factors to the undisputed material facts of the case at bar, this court finds that the theaters are located within close proximity to each other — roughly 3.5 miles apart and a five minute drive off the same major thoroughfare, 1-190; the two theaters, as acknowledged by Fedeli, have no barriers that would preclude travel between them; Fedeli has further acknowledged that Showcase North is its competitor which operates in, and draws customers from, the same geographic marketplace, as well as advertises in the same Worcester metropolitan area newspaper— the Telegram & Gazette. Based on the foregoing, the court concludes that there is no genuine issue of material fact that substantial competition exists between West Boylston and Showcase North.
Proper Business Purpose
Moreover, because the two theaters were in substantial competition, National was properly concerned that exhibiting first-runs at West Boylston simultaneously would diminish Showcase North’s income. Given that Showcase North’s building cost was nearly twenty-five time more than West Boylston’s, it is reasonable for National to attempt to protect its ability to recoup its investment. Additionally, Paramount had a legitimate interest in the revenue generated by Showcase North, because its revenues were paid, in part, out of each movie’s gross. Paramount, as the defendant-distributors in Theee Movies, “wished to reach the largest number of viewers with the smallest number of movie prints, to recoup quickly [its] own investment.” 828 F.2d at 1400. This court must conclude-that, in light of West Boylston’s failure to prove that its gross profits were at least equal to those generated by Showcase North, West Boylston is unable to demonstrate that Paramount’s grant of clearance to National was not for a legitimate business purpose. Id. at 1399.
As for the effects of clearances on competition, this court finds, upon balancing the legitimate business justifications against the anti-competitive effects thereof, that the clearances clearly reduced intrabrand competition by preventing West Boylston from showing first-run films simultaneously with Showcase North.[39] The clearances also, however, encouraged interbrand competition by forcing West Boylston to find alternative sub-run movies to exhibit and promote.[40] That West Boylston may have been adversely effected by the clearances is insufficient. “Antitrust laws were enacted for the protection of competition, not competitors.” Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488 (1977) (emphasis in original). Given that the United States Supreme Court has “repeatedly confirmed in vertical restraint cases that interbrand competition, as opposed to intrabrand competition, is the primary goal of antitrust laws,” Orson, Inc., 79 F.3d at 1368 (citations omitted) (emphasis added), this court concludes that the balance rests in the defendants’ favor.
b. Injury to Competition
A second element of the burden of showing that the clearances were unlawful is a demonstration of injury to competition. See Hill Frozen Foods & Serv., supra at 544 (the agreement becomes violative of antitrust principles only if it is anticompetitive in purpose and effect). See also Orion, Inc., supra at 1366; Quaker *539 State Corp., 839 F.Sup. at 80. West Boylston has failed to produce evidence that National’s clearance had any anticompetitive impact.
As the summary judgment record reflects, and as acknowledged by West Boylston, other exhibitors within the greater Worcester metropolitan market, such as the Hoyts theaters in Westborough and the Solomon Pond Mall in Berlin, regularly show first-run films day-and-date with Showcase North. Competition is thus alive and well. Accordingly, there being no evidence of any injury to competition, this court finds that no reasonable jury could find that the clearances violated G.L.c. 93, §4.
B. Monopolization in violation of G.L.c. 93, §5
The second arrow in West Boylston’s antitrust quiver carries the allegation that National used its ownership of over 1,000 screens across the United States and its control over Paramount, discussed supra, to monopolize the exhibition of first-run films in the greater Worcester metropolitan area in violation of G.L.c. 93, §5.[41] West Boylston theorizes that National effectively deprived West Boylston of any chance to compete for first-run films by using its alleged dominant position to obtain exclusive clearances from Paramount. As set forth below, West Boylston’s theory lacks substantive foundation.
To establish monopolization under G.L.c. 93, §5, West Boylston must show “both that the defendants have [ 1 ] monopoly power in the relevant market and [2] that they have maintained or increased that power through anti-competitive conduct.” SMS Systems Maintenance Svcs, Inc. v. Digital Equip. Corp., 188 F.3d 11, 15-16 (1st Cir. 1999), citing United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966). See also Barry Wright Corp. v. ITT Grinnell Corp., 724 F.2d 227, 230 (1st Cir. 1983). West Boylston demonstrates neither.
Simply stated, “monopoly power is the power to control prices or exclude competition” from the relevant market. Syufy Enterprises v. American Multicinema, Inc., 793 F.2d 990, 993-94 (9th Cir. 1986). As evidence of National’s monopoly power, West Boylston asserts that National maintains 1,000 screens nationwide and controls Paramount’s issuance of clearances, that is, licenses exclusively to exhibit first-run motion pictures. West Boylston, however, has produced no evidence showing how either the maintenance of 1,000 screens nationwide or National’s “overlapping and common ownership” with Paramount metamorphose into monopoly power. In contrast, the defendants have produced evidence, via the expert testimony of James Mack Folsom, that National owns and operates only 3.1% of all screens nationwide. Because West Boylston fails to cite any controlling legal authority which establishes that such a miniscule share of the market constitutes monopoly power, this court declines so to find. Indeed, precedent seemingly proscribes such a result. See Syufy Enterprises v. American Multicinema, Inc., 793 F.2d at 994-95, and cases there cited.
West Boylston further juxtaposes National’s fluctuating admission prices over the past few years with its own admission prices and offers that comparison as evidence that National controls prices in the Worcester metropolitan area. While it may not be disputed that National has, on occasion, raised or reduced the price of admission at its Showcase North theater, West Boylston’s bare assertion is insufficient to establish that National controlled market prices. Moreover, even if Showcase North may have charged higher admission prices than West Boylston would charge if afforded the opportunity to exhibit first-run- films, that fact does not prove that National controlled admission prices. Indeed, West Boylston ignores a most salient point: Showcase North cost approximately twenty-five times more to construct than did West Boylston. It only makes sense that in attempting to recoup its multi-million dollar outlay for Showcase North, National would charge higher fees in order to both maximize its rate of return and reduce its investment recovery period.
Further, West Boylston contends that the defendants’ “clearance agreement” excludes “competition between theaters exhibiting first-run films since consumers have no other option than to attend a theater owned by National.” See West Boylston’s Opposition to Defendants’ Motion for Summary Judgment at 31. Not only is the Rule 56(c) record entirely bereft of evidence supporting West Boylston’s position, but the record also belies West Boylston’s assertion. As identified by West Boylston, the relevant geographic market is the greater Worcester metropolitan area. The relevant product market is the exhibition of first-run films.[42] Within the greater Worcester metropolitan area, West Bolyston’s booker, Zides, acknowledged that there are at least two other exhibitors that show first-run films, day-and-date with National’s Showcase North — the Westborough Hoyts and the Hoyts at Solomon Pond Mall in Berlin. Given that other exhibitors regularly show first-run films day-and-date with Showcase North, this court infers that there were no barriers to competitors seeking entry into the market.
Viewing the evidence in a light most flattering to West Boylston, this court concludes that West Boylston cannot establish a cause of action for either monopolization or an attempt to monopolize first-run films in the greater Worcester metropolitan area in violation of G.L.c. 93, §5. Stated differently, the Rule 56(c) record in the instant case contains no significantly probative evidence that either Paramount or National engaged in sinister practices or otherwise suffocated competition. The theoretical possibilities West Boylston advances are thus inadequate to resist the defendants’ summary judgment motion on Count I of West Boylston’s Massachusetts Antitrust Act claims.
Defendants’ motions will accordingly be ALLOWED as to Count I of the Complaint.
*540 C.Massachusetts Consumer Protection Act, G.L.c. 93A
In Count II of its complaint, West Boylston further claims that Paramount “blacklistledl [it] from first-run films ... to favor its commonly controlled . . . National [and to] put West Boylston out of business" in violation of G.L.c. 93A, §11. At first glance, the law appears to favor the defendants’ assault upon Count II because a parasitic G.L.c. 93A claim “must fail ... if the antitrust claims fail.” Ben Elfman & Sons, Inc. v. Criterion Mills, Inc., 774 F.Sup. at 687 (citations omitted). Thus, because, as determined supra, West Boylston’s antitrust claims fail, so too would its c. 93A claim if the antitrust claim had no siblings.
Here, however, West Boylston also alleges, as set forth in “D” infra, a violation of G.L.c. 93F, the Massachusetts Blind Bidding Act (Count III). For the reasons expressed in “D,” this court concludes that West Boylston has presented sufficient evidence to survive summary judgment on Count III. West Boylston’s G.L.c. 93A claim (Count II) will thus similarly avoid a premature demise. See G.L.c. 93, §4 as added by St. 1979, c. 630, §1 (“Any violations of the provisions of [the Blind Bidding Act] shall be deemed to be an unfair and deceptive trade practice, as defined in Section two of chapter ninety-three A”).
Accordingly, the defendants’ motions are DENIED with respect to Count II.
D.Massachusetts Blind Bidding Act, G.L.c. 93F
In United States v. Paramount Pictures, Inc., supra, the seminal antitrust case which restructured the film industry, the Supreme Court defined “blind bidding” as the “practice whereby a distributor licenses a feature before the exhibitor is afforded the opportunity to view it.” 334 U.S. at 157 n. 11. See also Chase Theaters, Inc. v. Paramount Pictures Corp., 25 Mass.App.Ct. 474, 476 n.1 (1988).[43] Massachusetts’ G.L.c. 93F, §2 proscribes blind bidding. That statute, while not making competitive bidding mandatory, establishes procedural guidelines which distributors are required to follow if they invite bids from exhibitors for licenses to show a particular film. See G.L.c. 93F, §3.[44]
One such procedure distributors must follow is that “once bids are solicited, the distributor shall license the picture only by bidding and may negotiate if he does not accept any of the original bids.” G.L.c. 93F, §3(4) (emphasis added). Moreover, the statute further provides that “all bids shall be submitted in writing and shall be opened at the same time and in the presence of the exhibitors, or their agents who submitted bids and are present at such time.” G.L.c. 93F, §3(2).
At bar, there is no dispute that, during its meeting with Fedeli and Zides in January of 1998, Paramount invited West Boylston to bid on films. Fedeli accepted Paramount’s invitation and submitted a written bid for “Star Trek.” As Fedeli stated in his affidavit (one paragraph that was not stricken by the court), his bid was returned, unopened. Under the plain and unambiguous language of G.L.c. 93F, §3(2), however, once Paramount invited West Boylston to bid, it was statutorily obligated, not only to license the underlying picture — whether to West Boylston or another theater — "only by bidding," but it was also required to open the bid in Fedeli’s or his agent’s presence. Neither happened here.
The defendants argue, however, that G.L.c. 93F is preempted because of the express terms of the Copyright Act, 17 U.S.C. §301 and because the Massachusetts statute interferes with their distribution rights granted by 17 U.S.C. §106 of the same Act. Contrary to the defendants’ assertions, this court sees no federal statutory infirmities in the application of G.L. 93F. See Jones v. Rath Packing Co., 430 U.S. 519, 526 (1977). See also Allied Artists Picture Corp. v. Rhodes, 679 F.2d 656, 663 (6th Cir. 1982) (finding Ohio Blind Bidding statute valid and not violative federal Copyright Act, 17 U.S.C. §§106 and 301). While precedent teaches that Paramount was not required to accept West Boylston’s bid, even if it were the highest bid, see Chase Theaters, Inc. v. Paramount Pictures Corp., 25 Mass.App.Ct. at 477 (distributor has no obligation to accept “what a disgruntled exhibitor might regard as the best bid”), once Paramount chose to use the bidding method of selling its product, the procedural guidelines of G.L.c. 93F, §3 had to be observed.
Here, the Rule 56(c) record establishes that the bidding process was facially defective. Given that (1) Showcase North did not bid on films, (2) West Boylston bid on at least one motion picture, “Star Trek," but (3) its bid was returned unopened, (4) Paramount did not license the first-run of “Star Trek” to West Boylston, (5) Paramount admitted that bidding was utilized when two or more exhibitors desired to view a single film, and (6) there is no evidence that Paramount disclosed any competing bids or opened West Boylston’s bid after it was solicited, this court finds that a reasonable jury could conclude that Paramount’s invitation to West Boylston to bid on films was nothing more than a sham.
In sum, the court concludes that there is a genuine issue of material fact as to whether or not the defendants’ conduct transgressed the Massachusetts Blind Bidding Act. Accordingly, the defendants’ motions for summary judgment are DENIED as to Count III.
E.Common Law claim of unlawful interference with business relations
In Count IV of its amended complaint, West Boylston alleges that Paramount’s grant of clearance to National constitutes an intentional and malicious interference with its actual and prospective business relationships, to wit, its customers. West Boylston contends that the defendants’ conduct “stamp[ed] it a *541 ‘sub-run’ theater . . .” and thus “caused damages to its business relationships with patrons since they stop attending or reduce their attendance at West Boylston.” Postponing for the moment West Boylston’s utter failure to demonstrate that patrons did, as it alleged, stop attending West Boylston because it only exhibited sub-run films, the court turns to the elements upon which West Boylston must produce evidence to forestall summary judgment.
To make out a case of intentional interference with a present or prospective contract, a plaintiff must prove that (1) “he had a business relationship or contemplated contract of economic benefit with a third party,” American Private Line Svcs. v. Eastern Microwave, Inc., 980 F.2d 33, 36 (1st Cir. 1992), (2) “the defendant knowingly induced the third party to break the contract,” Melo-Tone Vending, Inc. v. Sherry, Inc., 39 Mass.App.Ct. 315, 318 (1995), (3) the defendant’s interference, in addition to being intentional, was improper in motive or means, United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 815-17 (1990), and (4) “the plaintiffs loss of advantage directly resulting from the defendant’s conduct.” American Private Line Svcs., supra at 36.
Fast forwarding to the denouement of the present case, even if this court were to assume arguendo, that West Boylston had a business relationship (or a contemplated contract of economic benefit) with its patrons, that National knew of such prospective relationships, and that West Boylston was harmed by National’s request for (and subsequent receipt of) clearance, there is absolutely no evidence from which a jury could reasonably find that National induced any patrons to do anything. In order to meet that element of the interference tort at these summary judgment proceedings, West Boylston was obligated to come forward with some admissible and probative evidence of inducement. See Godbout v. Cousens, 396 Mass. 254, 261 (1985) (non-movant must submit admissible evidence of the existence of a dispute as to material facts). This, West Boylston has failed to do.
West Boylston’s conclusory and self-serving statements — that National somehow “stamped” West Boylston a “sub-run” theater and thus somehow convinced patrons to stop attending its theater — are insufficient. See also Glidden v. Maglio, 430 Mass. 694, 697 (2000) (conjecture is insufficient to defeat summary judgment). See also Ferruzzi v. E.Z. Disposal Service, Inc., Civil Action No. 99-2045E, 2000 WL 286725, at *8 (Mass.Super.Ct. Feb. 17, 2000) (same), citing Polaroid Corp. v. Rollins Environmental Services (NJ), Inc., 416 Mass. 684, 696 (1993) (stating that “bare assertions and conclusions regarding a company officer’s understandings, beliefs, and assumptions are not enough to withstand a well-pleaded motion for summary judgment”). Moreover, as set forth below, the Rule 56(c) record is devoid of any evidence that Paramount’s clearance and National’s request therefore were improper.
Further, as in United Truck, supra, there is no evidence that National’s, request for clearance was improper. Specifically, there is no evidence that National violated a statute or precept of common law.[45] The instant record is barren, of any showing that National used threats, misrepresented any facts, defamed West Boylston or used any improper means to impact either an existing contract or a prospective one. And, there is no evidence that National owed West Boylston a duty of non-interference. See United Truck, 406 Mass. at 81 and n.8.[46] There is evidence, however, that Fedeli knew West Boylston and Showcase North were to be competitors, were located approximately 3.3 miles and a five to seven minute drive from each other and catered to the same populace. National invested nearly twenty-five times more in Showcase North than Fedeli invested in West Boylston. Additionally, at the time National requested clearance, West Boylston had not even opened for business.
In light of the long histoiy determining such clearances to be valid restraints of trade and legitimate or reasonable practices where theaters are, as found above, in substantial competition, this court concludes that no jury could reasonably find that National interfered with West Boylston’s relationships through improper motive or means. See and compare American Private Line Svcs., supra and United Truck, supra, with Melo-Tone, supra. By contacting Paramount and requesting clearance for all films over West Boylston from the date it opened, a concededly unorthodox and far reaching tactic, National simply engaged in lawful competition to secure its own business revenues and survival.
This court thus concludes that, as a matter of law, West Boylston’s expectancy or anticipated clientele is too speculative a root on which to rest a claim for interference with business relationships. To find otherwise would effectively render lawful competition impermissible. As the Appeals Court has noted, “(f]or competition and for the rough and tumble of the world of commerce, there is tolerance even though the fallout of that rough and tumble is damage to one of the competitors.” Melo-Tone, 39 Mass.App.Ct. at 319. That it may have been harmed by National’s clearance is simply not enough to afford West Boylston relief upon its common law tort claim. For the reasons set forth above, summary judgment shall be ALLOWED in favor of the defendants on Count IV of West Boylston’s amended complaint.
ORDER
It is hereby ORDERED that the defendants’ motions for summary judgment are ALLOWED as to Counts I and IV but DENIED as to Counts II and III.

 “Sub-run” films refers to the exhibition of (and granting of a license to exhibit) a film after its first-run. Appropriately, “first-run” films refer to the initial exhibition in a market of a particular film. See Affidavit of D. Barry Reardon (“Reardon Aff.”). For purposes of the instant discussion, this court assumes that the exhibition of first-run films is more profit *542 able than the exhibition of sub-run films.

A “vertical non-price restraints of trade” is generally defined as “anticompetitive agreements between entities operating at different levels of market structure” that do not concern the price for the underlying restrained product. See Black’s Law Dictionary, at 1562 (Sixth Ed. 1990). See also Orson Inc v. Miramax Film Corp., 79 F.3d 1358, 1368 (3d Cir. 1996) (citations omitted). Because clearances, by their very nature, involve contracts between businesses on different levels of the market chain (e.g. distributors and exhibitors), and do not involve the price of viewing the underlying films, courts have deemed such contracts to be “vertical non-price restraints of trade.” Theee Movies of Tarzana v. Pacific Theaters, Inc., 828 F.2d 1395, 1398 (9th Cir. 1987), cert. denied, 484 U.S. 1066 (1988), citing United States v. Paramount Pictures, 334 U.S. 131, 144-46 (1948). This court sees no reason to depart from such well established definitions.

As framed by West Boylston in its OPPOSITION TO NATIONAL AMUSEMENTS (sic) MOTION FOR LEAVE TO FILE MORE THAN 30 INTERROGATORIES, however, ”[T]he only issue for decision in this case is whether the Clearance Agreement is unreasonable and therefore unlawful.” See Exhibit 26 attached to Affidavit of Jennifer Grace Miller.

The defendants also, as set forth below, separately move to strike the Affidavits of West Boylston’s “experts” David Fedeli (“Fedeli”) and Martin Zides (“Zides”). Similarly, West Boylston has moved to strike the defendants’ proffered “expert” affidavits.

As part of the Background section, because the parties fail to proffer basic information surrounding the distribution of films in the Rule 56(c) record, this court looks to similar cases in which clearances are at issue. The court incorporates such basic propositions herein. The court finds the facts so incorporated to be reasonable inferences drawn from the evidence.

Simultaneous runs within a market are referred to as ‘day-and-date’ runs. Affidavit of D. Barry Reardon at p. 4 (“Reardon Aff.”). There are no long-term or multi-picture film exhibition licensing agreements between distributors and exhibitors. Id.

These “bids” usually include certain proposed terms, such as “the guaranteed minimum the theater (or exhibitor) will pay the distributor regardless of the movie’s success, division of profits between the exhibitor and distributor, and the time period the movie will show.” Theee Movies of Tarzana v. Pacific Theaters, Inc., 828 F.2d at 1397.

“Estimating a particular theater’s grossing potential is a complex judgment call, which depends on such factors as the location of the theater, its cleanliness, and its history and reputation as a full-time first-run theater.” Houser v. Fox Theaters Management Corp., 845 F.2d 1225, 1228 (3d Cir. 1988).

Fedeli acknowledged that his decision to build was based upon an observation of “what [had been] going on in the business over the last thirty years." More to the point, Fedeli admittedly “made a business decision based upon past experience and [his] years in the industry that [West Boylston] was a viable location.” Fedeli never did or reviewed any written studies to support his theory of drive times, never attempted to determine the demographic area from which he would attract patrons, never contacted any of the motion picture distributors, including Paramount, about either obtaining first-run films or building and operating the West Boylston Cinema, and never hired any experts or consultants to advise him on the viability of a theater in West Boylston. West Boylston Cinema contends that it did consult with other experts. It points to pages 49 and 53 of David Fedeli’s deposition in which he testifies that he conversed with Steve Minasian. There is nothing in the record, however, evidencing that Minasian was an “expert" as West Boylston Cinema contends. Accordingly, based on the totality of his deposition testimony, this court concludes that Fedeli, and thus West Boylston, never consulted with or hired an expert to advise it on the viability of a theater in West Boylston.

Fedeli acknowledged that before he built West Boylston he was “well aware” of several competitive challenges caused by National’s overall presence in the marketplace. Specifically, Fedeli acknowledged that he knew National owned and operated three theaters within the ten-mile radius surrounding his proposed theater site in West Boylston. National’s Showcase North eighteen-screen multiplex theater was “approximately three and a half to four miles” away and a five-minute drive from his proposed site, West Boylston theater and Showcase North were in the “same marketplace,” and Showcase North was a “direct competitor” that catered to the same patrons. According to National’s own internal and “Highly Confidential” memorandum, which was based on its own ad hoc study, National acknowledged, however, that Showcase North drew only six percent to eight (8%) percent of its patronage from West Boylston’s immediate market.

The seating capacities of the individual auditoria vary from a little over 100 in the smallest, to 210 in the largest.

The Showcase North theater originally opened in 1995 with seven screens. In 1996, National added seven more screens to Showcase North, and an additional four on June 19, 1998, bringing the total number of screens to eighteen.

Two auditoria have 500 seats; two have 400 seats; two have 299 seats; three have 200 seats; five have 183 seats; and-four have 110 seats.

West Boylston, through its “film booker” and proffered “expert,” Martin E. Zides (“Zides”), acknowledges that the Showcase North theater is a “first class theater,” is “superior” to West Boylston and “has significantly greater grossing potential than West Boylston.” David Fedeli (“Fedeli”), the owner of West Boylston Cinema and its other proffered “expert,” repeated Zides’ assessment, acknowledging that Showcase North is “a first rate theater” that “provides a movie distributor an opportunity to get a better grossing potential.”

The defendants correctly point out that West Boylston fails to expressly define the relevant market in which the defendants are alleged to have restrained trade in violation of the Massachusetts Antitrust Act. For instance, Fedeli and Zides, West Boylston’s proffered experts, identified different markets. When asked what population he looked at when determining to build a theater, Fedeli acknowledged that it was the ten mile radius surrounding the location where the West Boylston Cinema now is, although the seven mile radius was more densely populated. See Fedeli Depo. Vol. 1 at 47-48 and Vol. 3 at 160 (emphasis added). Fedeli later defined the geographic market, which was being restrained by the conduct of National, as the Greater Worcester Metropolitan area, also known as the Worcester Zone, and including a seven mile radius presumably also surrounding the proposed site of West Boylston. Fedeli Depo. at 159-60 (emphasis added). In contrast, Zides, the other expert offered on behalf of West Boylston, defines the Greater Worcester “area” to include “Worcester, Shrewsbury, Westboro, Berlin, [and] Boylston.” Zides Depo. at 74-75. See note 2, supra. Zides acknowledged, however, that the theaters within the Greater Worcester area included, in addition to West Boylston and Showcase North, Hoyts Westboro Cinema, Hoyts Solomon Pond Mall Cinema and White City. Hoyts Westboro and Hoyts Solomon Pond Mall played day-and-date, first-run movies with Showcase North. See Newspaper clipping dated Friday October 16, 1999, and Friday October 22,1999 attached to Jennifer Grace Miller Affidavit (“Miller Aff.”) as Exhibit 36.
Nonetheless, given that all facts are to be taken in a light most flattering to the non-movant, this court finds that West Boylston has sufficiently articulated the relevant market. Its *543 articulation, however, as set forth below, does not shield it from its own sword.

Contrary to the defendants' assertions, West Boylston has sufficiently identified the relevant product market on which it based its antitrust claims against Paramount and National as “the distribution of commercial first-run films for first-run exhibition in the Greater Worcester metropolitan area.” See Plaintiffs Supplemental Answers to Interrogatories #14 and 15 attached to Miller Aff. at Exhibit 30.

George Leavitt’s function or relevance is not demonstrated by the summary judgment record. His position, however, is immaterial.

Fedeli, Zides, and hence, West Boylston, knew that clearances were a common practice in the motion picture industry when West Boylston was built.

It is undisputed that Cooper also contacted film distributors other than Paramount to request clearance over West Boylston. Because the case at bar concerns only Paramount, however, this court considers only Paramount’s grant of clearance vis-a-vis National and West Boylston.

It is unclear what impact, if any, Paramount’s grant of clearance to National had on West Boylston’s ability to continue exhibiting sub-run movies.

 Paramount has not conducted any studies to determine whether a day-and-date or first-run exhibition with West Boylston and Showcase North would maximize its revenues or enhance the market. See Molen Depo. at 53 and 106. Similarly, however, neither has West Boylston. See Zides Depo. at 81-92.

Fedeli stated in his Affidavit in opposition to the instant motions that, “On October 29, 1998, Paramount testified through its Branch Manager Thomas Molen that I would be permitted to bid for upcoming "Star Trek1' film if I chose to do so. Less than a month later . . ." Based on that statement, this court inferred that he submitted a bid in November 1998.

Mass.R.Civ.P. 56(e) provides in relevant part that,
Supporting affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.

The court notes one “affirmation” in particular. In paragraph four (4) of his Affidavit, Fedeli states that “Paramount makes more money in Fitchburg by permitting Cinema World and Loews to play day-and-date than it did with Loews alone before I opened [Cinema World] in 1995.” Not only does Fedeli fail to explain the association between Lowes/Cinema World and West Boylston/National, but he also lacks, as he readily admitted during his deposition, personal knowledge of “any film distributors’ film rentals receipts in a situation where that distributor is playing his films day-and-date or exhibitors are playing his films day-and-date.” See Deposition of David Fedeli Vol. 4 at p. 108 attached to Miller Aff. at Exhibit 1(C). At a bare minimum, paragraph four (4) must be disregarded. See Johnson v. Cohan, Civil Action No. 96-7352, 2000 WL 282594 at *10 (Mass.Super.Ct. Jan. 14, 2000) (finding “for purposes of summary judgment, affiant bound by her deposition testimony and cannot create a dispute of material fact by contradicting it”) [11 Mass. L. Rptr. 425]. See also Morrell v. Precise Eng’g, Inc., 36 Mass.App.Ct. 935, 937 (1994) (“Plaintiffs affidavit is not some sort of wand that can wave away the damage to his claim contained in testimony previously given at the deposition hearing”). Moreover, paragraph 9 refers to Fedeli’s “beliefs,” and paragraph 10 not only refers to his “beliefs” but also recites what Fedeli contends National ”know[s].” Such asseverations are inadequate to serve as competent evidence. See TLT Const. Corp. v. A. Anthony Tappe and Associates, Inc., 48 Mass.App.Ct. 1, 11 (1999).

The court also notes the general reluctance to disqualify proffered expert witnesses at the summary judgment stage of proceedings. See Cortes-Irizarry v. Corporacion Insular De Seguros, 111 F.3d 184, 187-88(1st Cir. 1997)(defendantsdid not move to strike plaintiffs’ expert affidavits; finding that, although the Daubert regime can play a role in the summary judgment phase of civil litigation, “courts must be cautious— except when defects are obvious on the face of a proffer — not to exclude debatable scientific evidence without affording the proponent of the evidence adequate opportunity to defend its admissibility); Den Norske Bank AS v. First Nat. Bank of Boston, 75 F.3d 49, 58 (1st Cir. 1996) (“At summary judgment . . . courts normally assume that the trier of fact would credit the expert testimony proffered by the nonmovant”); Noble v. Goodyear Tire & Rubber Co., 34 Mass.App.Ct. 397, 402 (1993) (finding plaintiff need not show a perfect case in opposition to summary judgment).

Fed.R.Evid. 702 provides in relevant part that “If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.” The Federal rule is the same as rule 702 of the Massachusetts Proposed Rules of Evidence. Higgins v. Delta Elevator Service Corp., 45 Mass.App.Ct. 643, 646 n.5 (1998), citing Commonwealth v. Lanigan, 419 Mass. at 15, 25 (1994). Pursuant to Rule 702, a trial judge must ensure that any and all scientific, technical, or other specialized knowledge testimony or evidence which is admitted is not only relevant, but also reliable. See Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999). This court appropriately looks to the construction of its federal counterpart for guidance. See Lanlgan, supra (rules of evidence). See also Doe v. Senechal, 431 Mass. 78, 81 n.8 (2000) (considering rules of civil procedure).

This court notes that, even though Fedeli and Zides may be “generally familiar” with the Massachusetts Blind Bidding Act, their assumed familiarity without more is insufficient to demonstrate the type of “specialized” knowledge or intellectual rigor that characterizes the practice of an expert in that area of the law.

The absence of any factual basis supporting Zides’ opinion is revealed in the following exchange during his deposition:
Q: Is there any limitation to the number of theaters in a marketplace that should pay a movie day-and-date before it no longer enhances the market?
A: No.
Q; There’s no limitation?
A: I don’t believe so.
Q: So is it your opinion that every time you add a theater in the marketplace to play the same movie, it will enhance the market?
A: Yes.
Q: And on what do you base that opinion?
A: It’s a big world.
Mr. Remis: Well we’re not talking about the world.
Fedeli: There are a lot of patrons out there. A lot of patrons might choose not to go — people who live close to a theater might just be happy going to their own neighborhood theater and maybe they just don’t go to Worcester North, or they don’t go to Berlin, or maybe they do.
Q: Do you have any studies that indicate where people go? A: No.
Q: So this is just speculation on your part?
A: Absolutely. The whole thing was my opinion.
Zides Dep. Vol. 1 at p. 101-02.
*544 The absence of any factual basis supporting Fedeli’s opinion is demonstrated by the following deposition interchange:
Q: Have you been privy, have you seen in the last two years the amount of any film distributors’ film rentals receipts in a situation where that distributor is playing his films day-and-date or exhibitors are playing his films day-and-date?
A: I have not seen anything because I am not privy to that information.
Q: So this statement that they would actually enhance the film rental payments to the distributors is based upon your assumption that the grosses would be increased. Right?
A: No. Based upon my knowledge.
Q: Based on your belief that the grosses would be increased. Right?
A: Yes.
Fedeli Depo.Vol. 4 at p. 108.
This court is disinclined to accept such self-serving speculation as competent evidence. See Mass.R.Civ.P. 56(e).

See note 20, supra.

Specifically, paragraphs 1, 2, 3, so much of paragraph 6 that relates to Paramount, and paragraph 7.

Rule 56(f) provides that parties objecting to the timing of summary Judgment file an affidavit explaining that, “for reasons stated [they could not] present by affidavit facts essential to justify [their] opposition” to a summary judgment motion and request a continuance to complete discovery. Tetrault v. Mahoney, Hawkes & Goldings, 425 Mass. 456, 458-59 (1997), citing Commonwealth v. Fall River Motor Sales, Inc., 409 Mass. 302, 307 (1991); Aronson v. Commonwealth, 401 Mass. 244, 255 (1987), cert. denied, 488 U.S. 818 (1988); Godbout v. Cousens, 396 Mass. 254, 262 n.111 (1985).

Because West Boylston does not contend that the defendants’ experts are not qualified, this court declines to examine, in detail, their credentials under Lantnan, Daubert or, now, Kumho and Theresa Canavan's Case.

This court notes that, in antitrust cases, “care must be taken to ensure that inferences of unlawful activity drawn from ambiguous evidence do not infringe upon the defendants’ freedom.” Petruzzt’s IGA v. Darling-Delaware Co., Inc., 998 F.2d 1224, 1230 (3d Cir. 1993).

This court’s analysis under §§4 and 5 of the Massachusetts Antitrust Act is the same as that under the cognate federal act. G.L.c. 93, 81. Quaker State Corp. v. Leavitt, 839 F.Sup. at 79 n.1, citing Winter Hill, 691 F.Sup. at 543 n.5.

National’s and Paramount’s “unity of purpose" is illustrated by the following. As an exhibitor of motion pictures, National sought to maximize its profits on the exhibition of films in its Showcase North theater via clearances on first-run films. In so doing, National attempted (and in fact) secured Showcase North’s gross box office profits that, in turn, led to a higher return on Paramount’s investment, which necessarily produced higher profits for Viacom, its parent. Completing the circle and unifying the underlying symbiotic relationship, as Viacom’s profits grew, so too did its value to its controlling shareholder, and owner, National.

This court observes, however, that, but for West Boylston’s inability to show diversity of entities in proving a conspiracy under this court’s view of Copperweld, the summary judgment record otherwise raises an inference that Paramount engaged in antitrust conduct. See The Movie 1 & 2 v. United Artists Communications, 909 F.2d 1245, 1250-52 (9th Cir. 1990), cert. denied sub nom, Paramount Pictures Corp. v. The Movie 1 & 2, 501 U.S. 1230 (1991) (reversing summary judgment in favor of distributor, and finding no business justification for failing to accept higher bid of plaintiff and thus inference of antitrust conduct sufficient to create question of fact). See Infra for discussion of Paramount’s invitation to bid.

Because of the complexity of vertical non-price restraints and the likelihood that such vertical arrangements often enhance competition, judicial precedent instructs this court to weigh the anti-competitive effects of clearances against any legitimate business justifications for them under the rule of reason. American Tel. & Tel. Co. v. IMR Capital Corp., 888 F.Sup. 221, 252 (D.Mass. 1995). The true test of legality under the rule of reason is:
Whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts.
Orson, Inc., 79 F.3d at 1367, citing Board of Trade of Chicago v. United States, 246 U.S. 231, 238 (1918).

The court pauses here briefly to note that whether or not National maintained “market power” that restrained competition will be discussed Infra. See American Tel. & Tel. Co. v. IMR Caplral Corp., 888 F.Sup. 221, 252 (D.Mass. 1995) (noting that ”[a]s a preliminary matter, the plaintiff. . . must first demonstrate that the defendant is capable of causing antitrust harm by showing that it (the defendant) can exercise ‘market power’ in the relevant market”). See also Quaker State Corp., 839 F.Sup. at 80; Orion, Inc., 79 F.3d at 1367 (“In rule of reason cases, the plaintiff bears the initial burden by showing that the alleged combination or agreement produced adverse, anti-competitive effects within the relevant product and geographic markets”).

“Intrabrand competition is the competition between theaters simultaneously exhibiting the same film.” See Soffer v. National Amusements, Inc., 1996 WL 194947 at *5 n.10 (D.Conn. 1996).

“Interbrand competition is the competition between two films and is the primary concern of antitrust law.” Soffer, supra at *5 n. 10, quoting Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 52 n.19 (1977).

G.L.c. 93, 85 makes it unlawful for “any person or persons to monopolize or attempt to monopolize or combine or conspire with any other person or persons to monopolize any part of trade or commerce in the Commonwealth.” Broadly read, West Boylston’s complaint alleges that Paramount clearances granted to National constitute (1) monopolization, (2) attempts to monopolize and (3) a conspiracy to monopolize first-run distribution and exhibition of motion pictures. Despite the differing elements between a claim based upon monopolization and one based on attempted monopolization, there are significant overlaps in proof. To prove either violation under G.L.c. 93, 85, West Boylston must “demonstrate that the defendant engaged in anti-competitive conduct.” Soffer v. National Amusements, Inc., 1996 WL 194947 at *6. See Town of Concord, MA v. Boston Edison Co., 915 F.2d 17, 21 (1st Cir. 1990), citing United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966). See also Syufy Enterprises v. American Multicinema, Inc., 793 F.2d 990, 993-99 (9th Cir. 1986). For the reasons set forth Infra West Boylston has failed so to demonstrate. As a threshold matter, this court finds, as established supra, that the defendants could not conspire with one another. Accordingly, the court addresses only whether the defendants monopolized or attempted to monopolize the first-run distribution and exhibition of motion pictures in the greater Worcester metropolitan area.

This court assumes that there is, not “cross-elasticity of demand” between the exhibition of sub-run films and first-run films. Stated differently, sub-run films and first-run films are not reasonably interchangeable. See Syufy Enterprises v. American Multicinema, Inc., 793 F.2d 990, 994 (9th Cir. 1986).

Blind bidding is statutorily defined in G.L.c. 93F, §1 as the solicitation of bidding for, solicitation of negotiation for, or solicitations of offers for or agreeing to terms for the licensing or exhibition of, a motion picture if the motion picture has not been trade screened within the commonwealth before any such event has occurred.

General Laws c. 93F, §3, provides in full that,
if bids are solicited from exhibitors for the licensing of a motion picture within the commonwealth then:
1. The invitation to bid shall specify (a) the number and length of runs for which the bid is being solicited, whether it is a first, second or subsequent run, and the geographic area for each run; (b) the names of all exhibitors who are being solicited; (c) the date and hour the invitation to bid expires; and (d) the location, including the address, where the bids will be opened, which shall be within the commonwealth.
2. All bids shall be submitted in writing and shall be opened at the same time and in the presence of exhibitors, or their agents, who submitted bids and are present at such time.
3. After being opened, bids shall be subject to examination by exhibitors, or their agents, who submitted bids. Within seven business days after a bid is accepted, the distributor shall notify in writing each exhibitor who submitted a bid of the terms of the accepted bid and the name of the winning bidder.
4. Once bids are solicited, the distributor shall license the picture only by bidding and may negotiate if he does not accept any of the original bids.

That Paramount may have violated the Massachusetts Blind Bidding Act, G.L.c. 93F, §1 et seq. does not inure to National for purposes of an unlawful interference with business relationship claim.

See also Restatement (2d) Torts, §767 whereat is set out seven general factors for determining whether interference is improper.