828 F.2d 1395
 1987-2 Trade Cases 67,712
 THREE MOVIES OF TARZANA, Plaintiff-Appellant,
v.
PACIFIC THEATRES, INC., Columbia Pictures Industries, Inc.,
Paramount Pictures Corp., Twentieth Century Fox Film Corp.,
Universal Film Exchanges, Inc., Warner Brothers Distributing
Corp., MGM/UA Entertainment Co., Defendants-Appellees.
 No. 86-6211.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 6, 1987.
Decided Sept. 28, 1987.
 
 Maxwell M. Blecher, Los Angeles, Cal., for plaintiff-appellant.
 Harry B. Swerdlow, Rosenfeld, Meyer & Susman, James L. Seal, Beverly Hills, Cal., for defendant-appellee Pacific Theatres, Inc.
 Bertrand M. Cooper and Gregory P. Goeckner, Los Angeles, Cal., for defendants-appellees Columbia Pictures Industries, Inc., Paramount Pictures Corp., Twentieth Century Fox, Universal Film Exchange and MGM/UA Entertainment.
 Richard C. Yarmuth, Seattle, Wash., for defendant-appellee Warner Bros. Distributing Corp.
 Appeal from the United States District Court for the Central District of California.
 Before HALL and LEAVY, Circuit Judges, and AGUILAR,* District Judge.
 LEAVY, Circuit Judge:
 
 
 1
 The appellant, Theee Movies of Tarzana (TMT), is a partnership which owned a six screen movie theater in Tarzana, California. The appellees are a competing movie exhibitor, Pacific Theatres, Inc. (Pacific), and several movie distributors (the distributors). TMT alleges the appellees violated Sec. 1 et seq. of the Sherman Act. 15 U.S.C. Sec. 1 et seq. (1987). At issue is the reasonableness of certain "clearances" granted to Pacific by the distributors in movie exhibition licenses.
 
 
 2
 Movie exhibitors submit bids to movie distributors for the right, or license, to exhibit particular movies. These bids usually include certain proposed terms: the guaranteed minimum the theater will pay the distributor regardless of the movie's success, division of profits between the exhibitor and distributor, the time period the movie will show, and any clearances. Clearances preclude distributors from licensing other theaters, either specifically named or encompassed in a named geographic area, from showing a movie while it is being exhibited by the theater whose bid is accepted. Distributors evaluate these terms, and other factors, in determining which theaters they will license to show particular movies.
 
 
 3
 TMT claims that the distributors and Pacific acted in concert to provide Pacific's Galleria Theater with clearances over TMT's theater, giving the Galleria an unreasonable competitive advantage. TMT alleges the appellees' conduct eliminated price competition in the relevant market and eventually drove TMT out of business.
 
 
 4
 TMT sold its theater to Mann Theaters, after which Pacific and the distributors abandoned the clearances. TMT contends this demonstrates the clearances were unreasonable. TMT seeks damages for alleged business losses.
 
 
 5
 The district court granted summary judgment and entered a judgment of dismissal in favor of all the defendants. The district court held that TMT's theater and Pacific's theater were in substantial competition, that the clearances were reasonable, and that TMT had failed to produce evidence of either a conspiracy or an antitrust injury.
 
 FACTS
 
 6
 TMT owned and operated a six screen "subrun" movie theater on Ventura Boulevard in Tarzana, a community in California's San Fernando Valley, from 1972 until fall 1982. A subrun theater exhibits movies subsequent to their first run in a given area.
 
 
 7
 TMT acknowledges that the physical condition of its theater had deteriorated over the years. The theater also lacked the state of the art projection and sound systems that the first run movie theaters used. TMT's admission prices were about fifty cents less than those charged by first run theaters.
 
 
 8
 Most of the subrun movies shown by TMT had their first run at one of three theaters in Woodland Hills, a community, like Tarzana, located in the western portion of the San Fernando Valley. Until the late 1970's, only these few first run theaters existed in the Valley. Then, motion picture distribution patterns began to change nationwide. Due to the emergence of home video cassette recorders and cable television, distributors released movies simultaneously to increasing numbers of first run theaters, to enhance their chances of recouping their investment during the shorter theater release periods. Promotional costs escalated, similarly necessitating wider first run releases. These nationwide trends were accelerated in the Valley by the area's growing population.
 
 
 9
 In December 1980, Pacific opened the Galleria Theater in Sherman Oaks. The Galleria is also located on Ventura Boulevard, 4.4 miles east of TMT's theater. The Galleria is approximately a thirteen minute drive from TMT's theater. The Galleria was new, clean, and comfortable; offered first run movies; and had state of the art projection and sound systems.
 
 
 10
 Soon after the Galleria opened, Pacific began requesting clearances over TMT for all first run movies shown at the Galleria. Since the Woodland Hills first run theaters also historically requested and received clearances over TMT on first run movies, Pacific's request would normally not have had any additional effect on TMT's ability to obtain subrun movies. However, the Galleria exhibited its first run movies for a longer time period than did the Woodland Hills first run theaters. Thus, due to the Galleria's clearances, a time period existed between the end of a first run at a Woodland Hills theater and its end at the Galleria when TMT was prevented from showing the particular film. However, these movies were available to other subrun theaters in Woodland Hills over which the Galleria apparently did not have clearances.
 
 
 11
 According to various evidence, Galleria first runs lasted from one to five weeks longer than the Woodland Hills first runs. The parties dispute how many films were affected, with allegations ranging from two to thirteen films over an eighteen month period.
 
 
 12
 TMT contends that because of the Galleria's extended clearances, its ability to obtain subrun movies was "crippled" and its financial situation, previously healthy, began to deteriorate. This allegedly caused TMT to sell its assets to Mann Theaters (Mann) at the "distress" price of $1.4 million in October 1982.
 
 
 13
 Mann spent $658,000 remodeling and upgrading the theater to first run quality and renamed it Mann's Valley West (MVW). It installed new projection and sound equipment, and began aggressively bidding for first run movies. It took approximately nine months for movie distributors to license regularly Mann to exhibit first runs. MVW charges first run movie prices.
 
 
 14
 In June 1984, the Galleria stopped requesting clearances over MVW. TMT claims this is evidence that the Galleria's clearances over TMT were unreasonable. However, Pacific contends that it reluctantly withdrew its clearance requests, and only on a movie-by-movie basis, under pressure from the distributors who wanted more opportunities for exhibiting first runs.
 
 STANDARD OF REVIEW
 
 15
 This court reviews a district court's grant of summary judgment de novo. T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 629 (9th Cir.1987).
 
 
 16
 Summary judgment is disfavored in complex antitrust litigation if extensive factual determinations must be made concerning intent and motive. Betaseed, Inc. v. U & I Inc., 681 F.2d 1203, 1207 (9th Cir.1982). However, it is appropriate in "the absence of any significant probative evidence tending to support the complaint." First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968); Barry v. Blue Cross of Cal., 805 F.2d 866, 871 (9th Cir.1986). Then it can be applied "in the twinkling of an eye." Barry, 805 F.2d at 871 (quoting NCAA v. Board of Regents, 468 U.S. 85, 109-10 n. 39, 104 S.Ct. 2948, 2964 n. 39, 82 L.Ed.2d 70 (1984)).
 
 DISCUSSION
 
 17
 Clearances are vertical non-price restraints of trade. United States v. Paramount Pictures, Inc., 334 U.S. 131, 144-46, 68 S.Ct. 915, 922-23, 92 L.Ed. 1260 (1948); Ralph C. Wilson Indus. Inc. v. Chronicle Broadcasting Co., 794 F.2d 1359, 1363 (9th Cir.1986). Vertical non-price restraints of trade are evaluated under the rule of reason. Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 58-59, 97 S.Ct. 2549, 2561-62, 53 L.Ed.2d 568 (1977). The district court properly analyzed the clearances under the rule of reason.
 
 
 18
 To establish a cause of action for an unreasonable restraint of trade under the rule of reason, the plaintiff must show: "(1) An agreement among two or more persons or distinct business entities; (2) which is intended to harm or unreasonably restrain competition; and (3) which actually causes injury to competition." Reid Bros. Logging Co. v. Ketchikan Pulp Co., 699 F.2d 1292, 1296 (9th Cir.1983). The parties do not dispute that the first factor is met; the clearances are agreements between Pacific and each distributor. However, the parties do disagree on whether factors two and three are met.
 
 A. Reasonableness of Restraint
 
 19
 Determining whether a particular restraint is reasonable requires a " 'thorough investigation of the industry at issue and a balancing of the arrangement's positive and negative effects on competition'." Cascade Cabinet Co. v. Western Cabinet & Millwork, Inc., 710 F.2d 1366, 1373 (9th Cir.1983) (quoting Northrop Corp. v. McDonnell Douglas Corp., 705 F.2d 1030, 1050 (9th Cir.), cert. denied, 464 U.S. 849, 104 S.Ct. 156, 78 L.Ed.2d 144 (1983)). As acknowledged by courts over the years, "the whole system of runs and clearances ... purposely, and legitimately, discriminates between competing exhibitors." Naumkeag Theatres Co., Inc. v. New England Theatres, Inc., 345 F.2d 910, 912 (1st Cir.), cert. denied, 382 U.S. 906, 86 S.Ct. 241, 15 L.Ed.2d 158 (1965); see also Paramount Pictures, 334 U.S. at 145-46, 68 S.Ct. at 923-24.
 
 
 20
 Vertical restraints are reasonable if they are likely to promote interbrand competition without overly restricting intrabrand competition. Continental T.V., Inc. v. G.T.E. Sylvania Inc., 694 F.2d 1132, 1136-37 (9th Cir.1982). The Galleria's clearances reduced intrabrand competition by preventing TMT from showing first run movies simultaneously with the Galleria. However, they also encouraged interbrand competition by forcing TMT to find alternative subrun movies to exhibit and to promote. Moreover, the reduction in intrabrand competition was minor. First run movies still playing at the Galleria were shown as subruns at other Valley theaters over which the Galleria did not have clearances. The distributors did not refuse to deal with TMT; they simply offered the Galleria first run movies a few weeks later than TMT desired. Movies not playing at the Galleria were not affected; TMT could exhibit them as always. The clearances were a sound business practice for Pacific and the distributors.
 
 
 21
 Courts have found clearances in particular to be reasonable restraints of trade under certain conditions: when the theaters are in substantial competition, and the clearances are used to assure the exhibitor that the distributor will not license a competitor to show the movie at the same time or so soon thereafter that the exhibitor's expected income will be greatly diminished. Paramount Pictures, 334 U.S. at 145-46, 68 S.Ct. at 923-24.
 
 
 22
 The district court properly found that TMT's theater and the Galleria were in substantial competition. The theaters were located on the same major thoroughfare only a short distance apart, no barriers prevented patrons from driving between the theaters, TMT occasionally bid on first runs, TMT acknowledged it was substantially competitive with Woodland Hills theaters located farther away than the Galleria, TMT's former owner and film buyer admitted several times that they considered the two theaters to be in substantial competition, the Galleria is located in a regional shopping center which draws patrons from throughout the Valley, and both advertised throughout the Valley.
 
 
 23
 Because the two theaters were in substantial competition, Pacific was properly concerned that exhibiting first runs at TMT's theater simultaneously with the Galleria would diminish the Galleria's income. Pacific wanted to recoup its investment in the Galleria and advertising, rather than allow TMT's theater to "free ride" on its advertising.
 
 
 24
 The distributors had a legitimate business interest in the revenue generated by the theaters they licensed, because the distributors were paid, in part, out of each movie's gross profits. Id.; Southway Theatres, Inc. v. Georgia Theatre Co., 672 F.2d 485, 488 (5th Cir.1982). The distributors wished to reach the largest number of viewers with the smallest number of movie prints, to recoup quickly their own investment. TMT did not offer distributors as much in guaranteed payments and profits as did the first run theaters. The distributors made a sound business judgment that the Galleria would generate more profits for them, and sooner, than would TMT's theater.
 
 
 25
 We agree with the district court that the clearances were reasonable. The TMT theater and the Galleria were in substantial competition with one another. The clearances promoted interbrand competition without overly restricting intrabrand competition.
 
 B. Injury to Competition
 
 26
 An antitrust plaintiff must prove that the restraint in question injures competition in the relevant market; injury to the plaintiff alone is not sufficient to prove injury to competition. Robert's Waikiki U-Drive, Inc. v. Budget Rent-A-Car Sys., Inc., 732 F.2d 1403, 1408 (9th Cir.1984). "The antitrust laws, however, were enacted for 'the protection of competition, not competitors'." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (quoting Brown Shoe Co., Inc. v. United States, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962)). Finally, the alleged injury must be caused by a reduction, rather than an increase, in competition resulting from the restraint. California Computer Prod., Inc. v. IBM Corp., 613 F.2d 727, 732 (9th Cir.1979).
 
 
 27
 As the district court found, competition in the Valley has actually been enhanced by the entry of Mann's theater. Now an additional theater shows first run movies, thereby increasing competition among first run theaters. That the Galleria dropped its clearance requests over the MVW theater at the distributors' insistence demonstrates this increased competition, contrary to TMT's assertion that it demonstrates the clearances were unreasonable.
 
 
 28
 The injury to TMT, loss of its business, was not due to disruption in competition caused by the Galleria's clearances; rather, it was due to TMT's inability or unwillingness to compete. TMT acknowledged its movie bids were lower than the Galleria's. TMT did not make the changes in its theater facility or equipment necessary to compete in the market. Mann recognized the potential in the TMT theater, acquired it, and made the investment necessary to turn it into a competitive movie theater.
 
 
 29
 We agree with the district court's conclusion that TMT failed to demonstrate injury to competition by the Galleria's clearances over TMT's theater.
 
 
 30
 C. Clearances as a Horizontal Restraint of Trade
 
 
 31
 In its reply brief, TMT for the first time argues that the clearances resemble a horizontal restraint of trade, relying primarily on Zidell Explorations, Inc. v. Conval Int'l, Ltd., 719 F.2d 1465 (9th Cir.1983). Horizontal restraints of trade are generally presumed to be illegal. Cascade Cabinet, 710 F.2d at 1370.
 
 
 32
 TMT contends that "[b]ecause the restraint was initiated by a horizontal competitor of the plaintiff in order to curtail rivalry at the exhibitor level, the restraint is horizontal in nature, not vertical." While TMT believes the rule of reason standard is appropriate, it asserts that because the clearances are allegedly horizontal restraints, "a presumption of illegality exists."
 
 
 33
 Zidell is not applicable. The Zidell court held that "if a manufacturer deliberately withdraws its product from a price-cutting distributor at the request of a competing distributor as part of a conspiracy to protect the requesting distributor from price competition, the manufacturer has committed a per se violation of the antitrust laws." 719 F.2d at 1469. Here, no evidence exists, nor does TMT allege, that the distributors withdrew from doing all business with TMT. Business decisions were made on a movie-by-movie and bid-by-bid basis. The distributors simply did not offer TMT two to thirteen movies when TMT wanted them; no evidence suggests TMT did not or could not obtain those movies eventually.
 
 
 34
 While the effect of the clearances might have harmed the business of a price discounting competitor, Pacific and the distributors had legitimate business reasons for maintaining the clearances and Pacific's higher prices. No evidence supports TMT's contention that concern about TMT's prices motivated the clearances. The Galleria was a higher quality theater than TMT's, requiring more money to maintain, it competed with other first run theaters, necessitating advertising costs, and it invested in state of the art equipment. The distributors decided that for these reasons, the Galleria might attract a larger patronage than TMT's theater, and therefore increase their own revenues. The evidence supports the appellees' position that these were the reasons for the clearances.
 
 CONCLUSION
 
 35
 The clearances were reasonable restraints of trade and the appellant has failed to show an antitrust injury. The district court's decision granting summary judgment in favor of the appellees is affirmed.
 
 
 36
 AFFIRMED.
 
 
 
 *
 Honorable Robert P. Aguilar, United States District Judge, Northern District of California, sitting by designation