**Opinion issued December 5, 2019**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-17-00805-CV

_____

**IPIC-GOLD CLASS ENTERTAINMENT, LLC AND IPIC TEXAS, LLC, Appellants**

**V.**

**AMC ENTERTAINMENT HOLDINGS, INC., AMC ENTERTAINMENT, INC., AND AMERICAN MULTI-CINEMA, INC., Appellees**

---

On Appeal from the 234th District Court
Harris County, Texas
Trial Court Case No. 2015-68745

---

# O P I N I O N

This is an appeal from a summary judgment in an antitrust case. *See* TEX.

BUS. & COM. CODE § 15.05. In the underlying suit, iPic alleged that AMC and

Regal[1] conspired with each other and with third parties to exclude them from exhibiting popular films at two locations in Texas—Houston and Frisco. The trial court granted a temporary restraining order in iPic's favor, which this court affirmed. *See Regal Entm't Grp. v. iPic-Gold Class Entm't, LLC*, 507 S.W.3d 337, 356 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (*iPic I*). Regal settled with iPic, leaving only AMC as a defendant.

AMC moved for summary judgment on no-evidence and traditional grounds. AMC argued that its evidence conclusively disproved both the existence of a conspiracy and damages caused by AMC's actions. Without specifying the grounds, the trial court granted final summary judgment in favor of AMC, and iPic appealed.

On appeal, iPic asserts that: (1) the trial court erred by granting summary judgment for AMC on iPic's restraint of trade claim; (2) as a coconspirator, AMC is jointly and severally liable for damages sustained by iPic Houston; (3) it presented more than a scintilla of evidence that AMC and Regal engaged in an illegal horizontal conspiracy; and (4) AMC did not conclusively prove the absence

---

[1] We refer to appellants iPic-Gold Class Entertainment, LLC and iPic Texas, LLC collectively as "iPic," and we refer to appellees AMC Entertainment Holdings, Inc., AMC Entertainment, Inc., and American Multi-Cinema, Inc. collectively as "AMC." "Regal" refers to Regal Entertainment Group, which was a defendant in the underlying suit.

2

of conspiracy, and, alternatively, its responsive summary-judgment evidence raised a genuine issue of material fact as to the existence of a conspiracy.

We reverse the trial court's judgment, and we remand the case to the trial court for further proceedings.

## INTRODUCTION: THE FILM INDUSTRY AND ANTITRUST LAW

The film industry is comprised of three segments: producers, who make the movies; distributors, who license them to movie theaters; and exhibitors, who play the movies at theaters for movie-going audiences. AMC, Regal, and iPic are movie exhibitors. AMC and Regal largely provide a traditional theater experience, and iPic provides a premium experience that includes larger seating, as well as enhanced food and beverage service.

Exhibitors do not purchase the films they show; rather, they license the right to show them by competitive bidding or negotiation. *See generally U.S. v. Paramount Pictures*, 334 U.S. 131, 154–55 (1948) (discussing bidding and licensing); Note, *Blind Bidding and the Motion Picture Industry*, 92 Harv. L. Rev. 1128 (1979) (explaining business practices in the film industry). Exhibitors have obtained exclusive or semi-exclusive licenses called "clearances." *See Paramount Pictures*, 334 U.S. at 145 & n.5. These exclusive licenses prevented other theaters from playing the same movies at the same time, a practice called "day-and-date"

exhibition.[2] *See Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 539 n.7 (1954).

Film industry licensing practices have given rise to numerous antitrust lawsuits. *E.g.*, *Theatre Enters.*, 346 U.S. at 539; *Paramount Pictures*, 334 U.S. at 131; *Regal Entm't Grp. v. iPic-Gold Class Entm't, LLC*, 507 S.W.3d 337, 342 (Tex. App.—Houston [1st Dist.] 2016, no pet.); *Cobb Theatres III, LLC v. AMC Entm't Holdings, Inc.*, 101 F. Supp. 3d 1319, 1330 (N.D. Ga. 2015); *Theee Movies of Tarzana v. Pac. Theatres, Inc.*, 828 F.2d 1395, 1398 (9th Cir. 1987); *Paramount Film Distrib. Corp. v. Applebaum*, 217 F.2d 101, 124 (5th Cir. 1954).

Some cases challenge vertical restraints of trade like clearances, as when an exhibitor plaintiff sues one or more distributors and one or more exhibitors.[3] *E.g.*,

---

[2] Movie exhibitors submit bids to movie distributors for the right, or license, to exhibit particular movies. These bids usually include certain proposed terms: the guaranteed minimum the theater will pay the distributor regardless of the movie's success, division of profits between the exhibitor and distributor, the time period the movie will show, and any clearances. Clearances preclude distributors from licensing other theaters, either specifically named or encompassed in a named geographic area, from showing a movie while it is being exhibited by the theater whose bid is accepted. Distributors evaluate these terms, and other factors, in determining which theaters they will license to show particular movies.

*Theee Movies of Tarzana v. Pac. Theatres, Inc.*, 828 F.2d 1395, 1397 (9th Cir. 1987).

[3] "Agreements between entities at different market levels are termed 'vertical restraints.'" *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1368 (3d Cir. 1996) (citing *U.S. v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972)).

*Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366–68 (3d Cir. 1996); *Theee Movies*, 828 F.2d at 1397. Like other vertical restraints of trade, clearances are evaluated under the rule of reason, which requires the court to determine the reasonableness of the restraint by balancing the restraint's positive and negative effects on competition. *See Paramount Pictures*, 334 U.S. at 145–46 (listing competitive factors that could justify clearances as reasonable, and therefore legal, restraints of trade); *Theee Movies*, 828 F.2d at 1397. "Clearances that are 'unduly extended as to area or duration,' or granted over theatres 'not in substantial competition,' may be unreasonable under section 1" of the Sherman Act. *Harkins Amusement Enters., Inc. v. Gen. Cinema Corp.*, 850 F.2d 477, 486 (9th Cir. 1988) (quoting *Paramount Pictures*, 334 U.S. at 145–46).

Another type of antitrust claim involving the film industry alleges a group boycott. *E.g.*, *Southway Theatres, Inc. v. Georgia Theatre Co.*, 672 F.2d 485, 487 (5th Cir. 1982) ("Southway alleged that the appellees—competing Atlanta theatre chains and national film distributors—conspired to deprive Southway of the opportunity to license first run films and sought to eliminate it from competition in the licensing and exhibition of those films."). A group boycott involves "concerted action among other firms aimed at keeping the victim firms from competing." *Id.* at 492 n.6 (quoting L. SULLIVAN, HANDBOOK OF THE LAW OF ANTITRUST 231 (1977)). "'Group boycotts' are often listed among the classes of economic activity

5

that merit *per se* invalidation under § 1" of the Sherman Act. *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 293 (1985). Although "not all group boycotts are predominantly anticompetitive," when "firms with market power boycott suppliers or customers for the purpose of discouraging them from doing business with a competitor," courts apply a rule of *per se* illegality under antitrust laws. *Marlin v. Robertson*, 307 S.W.3d 418, 428 (Tex. App.—San Antonio 2009, no pet.) (citing *Nw. Wholesale Stationers*, 472 U.S. at 293, then *F.T.C. v. Ind. Fed'n of Dentists*, 476 U.S. 447, 458 (1986)).

Still other antitrust claims arising from the film industry involve allegations of "a practice known as 'circuit dealing,'" which "occurs when a defendant pools the purchasing power of an entire circuit" to prevent small exhibitors from bidding for film licenses on a theater-by-theater basis. *Cobb Theatres*, 101 F. Supp. 3d at 1342; *see also Cinetopia, LLC v. AMC Entm't Holdings, Inc.*, 18-2222-CM-KGG, 2018 WL 6804776, at *1 (D. Kan. Dec. 27, 2018) (denying motion to dismiss movie theater's case that alleged AMC used dominant market position to obtain exclusive licenses in violation of federal antitrust law). This practice has been found unlawful as a misuse of monopoly power. *Cobb Theatres*, 101 F. Supp. 3d at 1342.

iPic's case involves elements of each of the aforementioned types of antitrust cases. iPic's allegations submit that two major exhibitors, Regal and

AMC, used their combined dominant market positions—along with their simultaneous communication of refusals to deal—to influence distributors to grant clearances in their favor, thus restricting the licensing of movies to two startup iPic locations in Texas. This case comes to us as an appeal from a final take-nothing summary judgment. Because of this procedural posture, we express no opinion on the merits of using this type of theory to allege antitrust violations in the film industry. Our task here is limited by the motions filed in the trial court and limited to determining whether the summary-judgment evidence raised a triable issue of fact on the challenged elements of iPic's claims.

## FACTUAL BACKGROUND

Regal operated a theater in Houston (Regal Greenway), and AMC operated a theater in Frisco (AMC Stonebriar). Regal and AMC learned that iPic planned to build theaters in Houston and Frisco within about three miles of each exhibitor's existing theater. In July 2014, before either iPic Houston or iPic Frisco opened, both Regal and AMC requested clearances of the proposed nearby iPic theaters. Both Regal and AMC informed the major distributors that they would not license first-run movies that were also licensed to the nearby iPic theaters.

In November 2015, iPic opened a theater in Houston within three miles of Regal Greenway theater.[4] Several distributors declined Regal's request for clearances, but they allocated movies between Regal Greenway and iPic Houston. From November 2015 through January 2016, iPic Houston was limited in its ability to license films to show at its theater. iPic contends that it lost money due to this lost opportunity during the first few months of its operation in Houston.

In January 2016, iPic brought the underlying antitrust suit against Regal and AMC. iPic alleged that Regal and AMC had worked together to exclude it from the market in Houston and Frisco. iPic relied on the nearly simultaneous timing of the statements from representatives of both Regal and AMC informing distributors that they would not show movies that were also licensed to the nearby iPic theaters. Notably, these communications occurred long before either iPic theater had opened.

After Regal settled with iPic, AMC sought summary judgment on iPic's claims on no-evidence and traditional grounds. AMC challenged the evidence to support the existence of a conspiracy and its causation of damages alleged by iPic. AMC contended that it acted independently of Regal, and it could not be held liable for monetary damages sought by iPic Houston because it only sought clearances in Frisco. AMC's summary-judgment evidence included deposition

---

[4] The Frisco iPic had not yet opened when the trial court granted summary judgment for AMC in this case.

transcripts from employees and officers of both AMC and Regal, all of whom denied having conspired with or coordinated efforts regarding clearances of iPic theaters. AMC also provided deposition transcripts from several distributors denying that either request influenced any clearance decision as to the other city.

In response, iPic presented circumstantial evidence that AMC and Regal engaged in parallel behavior and had the motive and opportunity to conspire, including their involvement in "Open Road," a joint-venture film distribution company. iPic's evidence included business documents, emails, and transcripts of testimony from depositions and hearings. The trial court granted final take-nothing summary judgment in favor of AMC.

## ANALYSIS

On appeal, iPic challenges the trial court's judgment on its restraint-of-trade claim. iPic argues that it provided more than a scintilla of evidence of conspiracy in response to the no-evidence motion for summary judgment. It also argues that AMC did not conclusively negate the element of conspiracy, or alternatively, its summary-judgment evidence created a genuine question of material fact raising a triable issue on the existence of a conspiracy. Finally, responding to an argument made in the trial court, iPic argues that, as a coconspirator, AMC was jointly and severally liable for damages sustained by iPic Houston.

## I.      Summary judgment standards of review

A no-evidence motion for summary judgment is essentially a motion for a pretrial directed verdict. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 581 (Tex. 2006). A party may move for no-evidence summary judgment if, after adequate time for discovery, there is no evidence of one or more essential elements of a claim or defense on which the nonmovant would have the burden of proof at trial. TEX. R. CIV. P. 166a(i). "The motion must state the elements as to which there is no evidence." *Id.* The trial court must grant the motion unless the non-movant produces summary judgment evidence that raises a genuine issue of material fact. *Hahn v. Love*, 321 S.W.3d 517, 524 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (citing *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002)).

A movant for traditional summary judgment must establish that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *See* TEX. R. CIV. P. 166a(c); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215–16 (Tex. 2003). A defendant moving for traditional summary judgment must conclusively negate at least one essential element of each of the plaintiff's causes of action or establish conclusively each element of an affirmative defense. *Henkel v. Norman*, 441 S.W.3d 249, 251 (Tex. 2014) (per curiam); *Wendt v. Sheth*, 556 S.W.3d 444, 448 (Tex. App.—Houston [1st Dist.] 2018, no pet.).

We review a trial court's summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). "We review the evidence presented by the motion and response in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not." *Mack Trucks*, 206 S.W.3d at 582. "Summary judgments are generally disfavored in antitrust cases, especially when motive or intent is at issue." *Seven Gables Corp. v. Sterling Recreation Org. Co.*, C84-1057R, 1987 WL 56622, at *2 (W.D. Wash. June 25, 1987).

## II. Texas Free Enterprise and Antitrust Act

The Texas Free Enterprise and Antitrust Act of 1983 (TFEAA) was enacted to "maintain and promote economic competition in trade and commerce occurring wholly or partly within the State of Texas and to provide the benefits of that competition to consumers in the state." TEX. BUS. & COM. CODE §§ 15.01, 15.04. The TFEAA is construed to accomplish the expressly stated purpose "in harmony with federal judicial interpretations of comparable federal antitrust statutes to the extent consistent" with the statutory purpose. *Id.* § 15.04.

A plaintiff alleging a private cause of action for an antitrust violation must have standing, which requires an allegation that the plaintiff's injury was

11

proximately caused by the alleged antitrust violation. *See In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 396 (3d Cir. 2015); *see also* TEX. BUS. & COM. CODE § 15.21 (establishing private antitrust cause of action). The substantive elements of an antitrust restraint-of-trade claim are: (1) the existence of a contract, combination, or conspiracy and (2) a restraint that is (i) unreasonable per se or (ii) unreasonable under the rule of reason, adversely affecting competition in a particular market. *See Nw. Power Prods., Inc. v. Omark Indus., Inc.*, 576 F.2d 83, 90 (5th Cir. 1978); *see In re Mercedes-Benz Anti-Trust Litig.*, 157 F. Supp. 2d 355, 359 (D.N.J. 2001) (though "harm to competition in a particular market is the gravamen of a Sherman Act violation," per se violations are presumed to have a "pernicious effect on competition" and no inquiry into the harm caused in the relevant market is required).

Because Texas caselaw is limited, "we rely heavily on the jurisprudence of the federal courts." *In re Mem'l Hermann Hosp. Sys.*, 464 S.W.3d 686, 708 (Tex. 2015) (orig. proceeding) (quoting *Coca–Cola Co. v. Harmar Bottling Co.*, 218 S.W.3d 671, 688–89 (Tex. 2006)). *Accord DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 687 (Tex. 1990) ("Section 15.05 is comparable to, and indeed taken from, section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 (1988). Accordingly,

12

we look to federal judicial interpretations of section 1 of the Sherman Act in applying section 15.05(a) of our state antitrust law.").[5]

## III. Conspiracy

### A. The law

Under the TFEAA "[e]very contract, combination, or conspiracy in restraint of trade or commerce is unlawful." TEX. BUS. & COM. CODE § 15.05(a). Section 15.05, like the Sherman Act, "does not prohibit [all] unreasonable restraints of trade . . . only restraints effected by a contract, combination, or conspiracy." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 552 (2007) (quoting *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 775 (1984)). "Independent action is not proscribed." *Monsanto v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 760 (1984) ("A manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently."); *Valspar Corp. v. E.I. Du Pont de Nemours & Co.*, 873 F.3d 185, 190–91 (3d Cir. 2017) (Sherman Act prohibition on restraint of trade does not implicate "a single firm's independent action, no matter how anticompetitive its aim").

Antitrust claims are resolved "on a case-by-case basis, focusing on the 'particular facts disclosed by the record.'" *Eastman Kodak Co. v. Image Tech.*

---

[5] The Sherman Act provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1.

*Servs., Inc.*, 504 U.S. 451, 467 (1992) (quoting *Maple Flooring Mfrs. Ass'n v. U.S.*, 268 U.S. 563, 579 (1925)). Since direct evidence is rarely available in antitrust cases, *see In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 439 (9th Cir. 1990), plaintiffs may rely on both direct and circumstantial evidence. *Monsanto*, 465 U.S. at 764.

Parallel "business behavior is admissible circumstantial evidence from which the fact finder may infer agreement." *Theatre Enters.*, 346 U.S. at 540. Parallel behavior of defendants alone, however, is not conclusive evidence of the existence of an anticompetitive horizontal combination. *See Twombly*, 550 U.S. at 553. Businesses in a concentrated market depend on one another regarding price and output, and such interdependence or "conscious parallelism" is also not, by itself, illegal. *See id.*; *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993) ("Tacit collusion, sometimes called oligopolistic price coordination or conscious parallelism, describes the process, not in itself unlawful, by which firms in a concentrated market might in effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions."). "[C]onduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S.

14

574, 588 (1986). Although such parallel behavior is some circumstantial evidence of conspiracy, it is not enough to survive a motion for summary judgment. *See id.*

"[A]t the summary judgment stage . . . a plaintiff's offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently." *Twombly*, 550 U.S. at 553. "To survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of § 1 must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." *Matsushita*, 475 U.S. at 588 (quoting *Monsanto*, 465 U.S. at 764). Courts refer to such evidence as "plus factors." *E.g.*, *Chocolate Confectionary*, 801 F.3d at 398 (3d Cir. 2015); *Southway Theatres*, 672 F.2d at 501. Plus factors "serve as proxies for direct evidence of an agreement," and they "ensure that courts punish 'concerted action'—an actual agreement—instead of the 'unilateral, independent conduct of competitors.'" *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360 (3d Cir. 2004) (quoting *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 122 (3d Cir. 1999). No specific set of plus factors must be considered in every case; rather they can include any factual circumstance that unambiguously supports a conclusion of concerted action. *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 988 F. Supp. 2d 696, 711–12 (E.D. La. 2013). *See*

15

Nickolai G. Levin, *The Nomos and Narrative of* Matsushita, 73 Fordham L. Rev. 1627, 1710 (2005).[6]

Courts and commentators have identified the following as plus factors that may be relevant in an antitrust case: (1) evidence that the defendants had a motive to enter into a horizontal conspiracy; (2) evidence that the defendant acted contrary

---

[6] "Plus factor" is nothing more than an "inelegant" label for "the additional facts or factors required to be proved as a prerequisite to finding that parallel action amounts to a conspiracy." VI Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION P 1433(e) (2000). Sometimes courts use the term "plus factor" explicitly to describe this inquiry for the additional facts; other times, they merely look for the additional facts. Recent lower court examples are: *In re Flat Glass Antitrust Litig.*, 385 F.3d 350 (3d Cir. 2004); *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287 (11th Cir. 2003); *Blomkest Fertilizer, Inc. v. Potash Corp.*, 203 F.3d 1028, 1033 (8th Cir. 2000) (en banc); *Merck-Medco Managed Care, LLC v. Rite Aid Corp.*, No. 98-2847, 1999 WL 691840, at *9 (4th Cir. Sept. 7, 1999) (unpublished); *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 122, 124 (3d Cir. 1999); and *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1456 n.30 (11th Cir. 1991). Pre-*Matsushita* examples include: *In re Japanese Elec. Prods. Antitrust Litig.*, 723 F.2d 238, 304 (3d Cir. 1983); *Admiral Theatre Corp. v. Douglas Theatre Co.*, 585 F.2d 877, 884 (8th Cir. 1978); *Nat'l Auto Brokers Corp. v. Gen. Motors Corp.*, 572 F.2d 953, 1042–43 (2d Cir. 1978); *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 446 (3d Cir. 1977); *Venzie Corp. v. U.S. Mineral Prods. Co.*, 521 F.2d 1309, 1314 (3d Cir. 1975); *Del. Valley Marine Supply Co. v. Am. Tobacco Co.*, 297 F.2d 199, 202–07 (3d Cir. 1961); and *C-O-Two Fire Equip. Co. v. U.S.*, 197 F.2d 489, 493 (9th Cir. 1952).

Nickolai G. Levin, *The Nomos and Narrative of* Matsushita, 73 Fordham L. Rev. 1627, 1633 n.32 (2005).

to its economic self-interest;[7] (3) evidence implying a traditional conspiracy;[8] (4) opportunity for the defendant to conspire or feasibility of carrying out a conspiracy; (5) pretextual explanations for anticompetitive conduct; (6) sharing of information such as pricing information; (7) signaling; and (8) involvement in other controversies. *Pool Prods.*, 988 F. Supp. 2d at 711–12; *Flat Glass*, 385 F.3d at 360.

We consider a plaintiff's evidence of contract, combination, or conspiracy as a whole. *See Cont'l Ore Co. v. Union Carbide*, 370 U.S. 690, 699 (1962). "[P]laintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Id.*; *see U.S. v. Patten*, 226 U.S. 525, 544 (1913) ("It hardly needs statement that the character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.").

---

[7]    One federal appellate court has held that an action contrary to a defendant's economic self-interest is one that it would not take absent "assurances from other defendants that they would take the same action." *See City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 571 & n.33 (11th Cir. 1998).

[8]    "Traditional evidence of conspiracy can include 'overt acts more consistent with some pre-arrangement for common action than with independently arrived-at decisions.'" *Deborah Heart & Lung Ctr. v. Penn Presbyterian Med. Ctr.*, CIV. 11-1290 RMB KMW, 2012 WL 1390249, at *3 (D.N.J. Apr. 19, 2012).

## B. iPic's evidence

AMC's summary-judgment evidence included deposition excerpts from officers and employees of AMC and officers and employees of Regal. Each testified that he or she had not communicated with individuals from the other company about iPic or clearances.

In its motion for summary judgment, AMC argued that iPic could not establish that AMC caused or influenced Regal's decisions in Houston because "uncontested evidence" established that Regal decided to seek clearance of iPic Houston in April 2013, long before AMC learned anything about iPic Frisco. AMC asserted that "undisputed evidence prove[d] that the distributors who chose to license the films exclusively to Regal in Houston did so without regard to AMC."

"A summary judgment may be based on uncontroverted testimonial evidence of an interested witness, if the evidence is clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted." TEX. R. CIV. P. 166a(c). The Supreme Court of Texas has held that "could have been readily controverted" means that "testimony at issue is of a nature which can be effectively countered by opposing evidence." *Casso v. Brand*, 776 S.W.2d 551, 558 (Tex. 1989). "If the credibility of the deponent is likely to be a dispositive factor in the resolution of the case, then summary judgment is inappropriate." *Id.*

18

AMC's evidence that more than a dozen individuals who worked for AMC and Regal during the relevant time period denied talking to anyone from the other company about iPic or clearances is not capable of being effectively countered by opposing evidence because the testimony did not refer to independently ascertainable facts. And, even if the testimony was capable of being effectively countered by opposing evidence, the credibility of these interested witnesses would be a dispositive factor. Therefore, AMC did not meet its burden to conclusively prove that there was no contract, combination, or conspiracy. *Henkel*, 441 S.W.3d at 251; *Wendt*, 556 S.W.3d at 448.

Even if AMC had met its initial summary-judgment burden, iPic responded with summary-judgment evidence in support of its allegation that AMC and Regal conspired against iPic. As the plaintiff, iPic has the burden of proof at trial, at which time it must prove that Regal and AMC combined or conspired together; it is "not enough that a jury might disbelieve" AMC's evidence. *See Soodeen v. Rychel*, 802 S.W.2d 361, 365 (Tex. App.—Houston [1st Dist.] 1990, writ denied) (citing *Casso*, 776 S.W.2d at 558).

Though iPic must prove more than just parallel behavior by AMC and Regal, iPic's summary-judgment evidence is relevant to several plus factors. Summary-judgment evidence showed that clearances were not necessarily profitable in the short run but could help the exhibitors avoid overall losses in the

long run. Thus, AMC was acting against its short-term economic interest by seeking a clearance of the proposed iPic Frisco, and it was jointly motivated with Regal to attempt to prevent iPic's entry into the market.

Regal and AMC had the opportunity to conspire through the conduit of their film distribution joint venture, Open Road. The summary-judgment evidence demonstrated that there were direct communications between Open Road officers, including individuals who also were the CEOs of Regal and AMC. Though AMC asserted that the communications concerned other matters, it is evidence of the existence of a communication channel that could enable the conspiracy.

In late 2012, AMC created a new corporate policy regarding when it would seek clearances. A month later, AMC made a presentation to Open Road detailing the clearance strategy.[9] Two months later, prior to April 2013, Regal adopted the same policy regarding when and where to seek clearances. An executive from Regal informed an iPic executive that it planned to request clearances of iPic Houston. The Regal executive later said he was simply communicating Regal's clearance strategy and notifying iPic that it would no longer consider whether a nearby theater offered a dining format when making clearance decisions. This may be considered a pretextual explanation for anticompetitive behavior. AMC monitored Regal's use of its clearance strategy by consultation with Open Road.

---

[9]     AMC made the same presentation to other distributors as well.

20

By June 2014, AMC was ready to request clearances of iPic's proposed Frisco theater. An email from one AMC employee to upper executives indicated that he planned to make the clearance requests on July 1, 2014, unless a recipient of the email directed him to wait. The next day, the recipient of the email met with a top executive from Regal.[10] AMC did not request clearances of the proposed iPic Frisco theater on July 1, 2014. Instead, on July 8, 2014, AMC requested clearances of the proposed iPic Frisco, and that same day, Regal requested clearances of the proposed iPic Houston.

Examining iPic's summary-judgment evidence as a whole,[11] we conclude that the circumstantial evidence supports plus factors of motive, opportunity, actions against self-interest, a pretextual explanation for anticompetitive conduct, the sharing of information through Open Road, and other facts consistent with the existence of a traditional conspiracy. In this context, we conclude that, under both

---

[10] The substance of the meeting is not disclosed in the summary-judgment evidence.

[11] AMC asserted in its motion:

> iPic cannot offer a single piece of evidence to connect Regal's film licensing decision in Houston—made in 2013—to AMC in any way. iPic certainly cannot offer any evidence that some later purported collusion with AMC regarding Frisco *caused* Regal to request the clearances it had already decided to seek in Houston per Regal's standing policy.

To the extent that the reference to "no single piece of evidence" suggests the need for smoking-gun evidence, AMC is mistaken. iPic is entitled to rely on circumstantial evidence and to have all its circumstantial evidence considered as a whole. *See Cont'l Ore*, 370 U.S. at 699.

the no-evidence and traditional summary-judgment standards, iPic's evidence raised a triable question of fact as to the existence of a conspiracy.

**IV.    Liability for damages caused by the conspiracy**

In the trial court, AMC asserted that summary judgment was warranted because there was no evidence that AMC caused iPic's damages. AMC argued that it could not have caused iPic's damages because it sought clearance only of iPic Frisco, and iPic's damages were limited to those alleged by iPic Houston.

Under the TFEAA, a plaintiff must prove an "antitrust injury"—"injury of the type the antitrust laws were intended to prevent." *Mem'l Hermann Hosp. Sys.*, 464 S.W.3d at 705 & n.81 (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977)); *see Austin v. Blue Cross & Blue Shield of Ala.*, 903 F.2d 1385, 1389–90 (11th Cir. 1990) ("The antitrust injury concept . . . requires the private antitrust plaintiff to show that his own injury coincides with the public detriment tending to result from the alleged violation. This requirement increases the likelihood that public and private enforcement of the antitrust laws will further the same goal of increased competition.") (quoting P. Areeda and H. Hovenkamp, *Antitrust Law*, 335.1, at 261 (Supp. 1987)); A private antitrust plaintiff must also prove an injury to its business or property; that is, the antitrust plaintiff must prove that the antitrust violation caused its damages. *See Mem'l Hermann Hosp. Sys.*, 464 S.W.3d at 705; *see also Ala. v. Blue Bird Body Co., Inc.*, 573 F.2d 309, 317

(5th Cir. 1978) (antitrust violation must cause injury to antitrust plaintiff). The antitrust violation need not be "the sole cause of any alleged injury," but it must be "a material cause." *Blue Bird Body Co.*, 573 F.2d at 317.

"Antitrust coconspirators are jointly and severally liable for all damages caused by the conspiracy to which they were a party." *Wilson P. Abraham Constr. Corp. v. Tex. Indus., Inc.*, 604 F.2d 897, 904 n.15 (5th Cir. 1979), *aff'd sub nom. Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630 (1981); *see also Akin v. Dahl*, 661 S.W.2d 917, 921 (Tex. 1983) ("However, once a civil conspiracy is found, each co-conspirator is responsible for the action of any of the co-conspirators which is in furtherance of the unlawful combination."). "It is well-settled law that upon joining a conspiracy, a defendant becomes a party to every act previously or subsequently committed by any of the other conspirators in pursuit of the conspiracy." *Greenberg Traurig of N.Y., P.C. v. Moody*, 161 S.W.3d 56, 101 (Tex. App.—Houston [14th Dist.] 2004, no pet.).

iPic argues on appeal that, as a coconspirator, AMC was liable for Regal's actions in requesting clearances of iPic Houston. iPic's summary judgment evidence included its damages model, which was some evidence of the damages it contends were caused by the alleged conspiracy. As coconspirators, AMC and Regal would each be liable for the actions taken by the other in furtherance of the alleged conspiracy. *See id.*

23

AMC argues that iPic was required to show that the harm to iPic Houston would not have occurred but for the alleged conspiracy, and that Regal would have independently requested a clearance of iPic Houston regardless of the existence of any alleged conspiracy. AMC also argues that its alleged participation in a conspiracy with Regal was irrelevant because several distributors testified or averred that they made their decisions regarding licensing to Regal independently of AMC's clearance requests. These are arguments about whether Regal acted independently or in furtherance of a conspiracy with AMC.

We have already concluded that the plus factor evidence created a triable question of fact on the question of conspiracy. We likewise conclude that the summary judgment evidence created a triable question of fact about causation.

## Conclusion

Having concluded that genuine issues of material fact exist as to conspiracy, we sustain iPic's issues, reverse the summary judgment, and remand the case to the trial court.

Peter Kelly
Justice

Panel consists of Justices Lloyd, Kelly, and Hightower.